SIDLEY AUSTIN LLP
Thomas R. Califano (24122825)
Jeri Leigh Miller (24102176)
Parker G. Embry (24126826)
Chelsea McManus (24131499)
Dallas, Texas 75201
Dallas, Texas 75201
Telephone:    (214) 981-3300
Facsimile:    (214) 981-3400
Email:    tom.califano@sidley.com
     jeri.miller@sidley.com
     parker.embry@sidley.com
     cmcmanus@sidley.com

SIDLEY AUSTIN LLP
Stephen E. Hessler (*pro hac vice* pending)
Patrick Venter (*pro hac vice* pending)
Weiru Fang (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:    (212) 839-5300
Facsimile:    (212) 839-5599
Email:    shessler@sidley.com
     pventer@sidley.com
     weiru.fang@sidley.com

SIDLEY AUSTIN LLP
James W. Ducayet (*pro hac vice* pending)
Steven E. Sexton (*pro hac vice* pending)
Andrew F. Rodheim (*pro hac vice* pending)
One South Dearborn
Chicago, Illinois 60603
Telephone:    (312) 853-7000
Facsimile:    (312) 853-7036
Email:    jducayet@sidley.com
     ssexton@sidley.com
     arodheim@sidley.com

*Proposed Attorneys for the Debtor
and Debtor in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>MERIT STREET MEDIA, INC.[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 25-80156 (SWE) |
| MERIT STREET MEDIA, INC.<br><br>Plaintiff,<br><br>v.<br><br>TRINITY BROADCASTING OF TEXAS,<br>INC., AND TCT MINISTRIES, INC.<br><br>Defendants. | Adv. Proc. No. 25-_____ |

---

[1] The last four digits of the Debtor's federal tax identification number are 8990.  The Debtor's mailing address is 5501 Alliance Gateway Fwy, Fort Worth, TX 76177

## ADVERSARY COMPLAINT FOR DECLARATORY AND MONETARY RELIEF

Plaintiff Merit Street Media, Inc., ("Merit Street"), by and through its undersigned attorneys, files this adversary proceeding pursuant to 11 U.S.C. § 105 and 28 U.S.C. § 2201 against Trinity Broadcasting of Texas Inc. ("TBN") and TCT Ministries, Inc. ("TCT"), and alleges as follows:

## NATURE OF THE CASE

1.      This lawsuit arises out of a sad but oft told story: one side lived up to its commitments but the other, the Defendant TBN, did not. Moreover, these failures by TBN were neither unintended nor inadvertent. They were a conscious, intentional pattern of *choices* made with full awareness that the consequence of which was to sabotage and seal the fate of a new but already nationally acclaimed network which has, since its launch in April of 2024, delivered its viewers with cutting edge reports, interviews, and in-depth analysis of national importance. This fresh voice on the national stage is inexorably going dark, going off the air because TBN has refused to honor its commitment to transfer its must carry rights and thereby provide national distribution for the network—Merit Street. And this conduct stretches beyond mere breach of contract and extends to breach of fiduciary duty and breach of the duty of good faith and fair dealing—the full extent to which may require a forensic accounting audit.

2.      TBN formed Merit Street as a joint venture and contractually committed to provide valuable services to the joint venture.  But TBN then reneged on its obligations and abused its position as the controlling shareholder of Merit Street to improperly and unilaterally burden Merit Street with unsustainable debt, doing so either without notice or in direct violation of promises not to do so.  In total, TBN transferred its obligations to Merit Street causing it to pay or incur

2

obligations to third parties in excess of $100 million—obligations that are the responsibility of TBN, not Merit Street.

3.      The most egregious impact is TBN's conscious and knowing choice to cause Merit Street to lose its national distribution by withholding distribution payments despite repeatedly acknowledging those distribution payments were 100% TBN's sole responsibility. Simply put, as a result of TBN's conduct, Merit Street has nowhere to send its broadcast signal and nowhere to air its programming no matter how great it may be.

4.      In January 2023, TBN and a company majority owned by Dr. Phillip C. McGraw ("Dr. Phil") called Peteski Productions, Inc. ("Peteski") entered into an agreement to form a joint venture (the "Joint Venture Agreement"). The joint venture would later be called Merit Street Media. Merit Street was formed by TBN to create a new network, with TBN being required to transfer its must carry rights to Merit Street and provide distribution and all production services as well as to make certain payments to Peteski. Certain new programming was to be and was provided by Peteski. Peteski went above and beyond its contractual duties in an effort to save the network, including funding the expenses (including payroll) that should have been borne by TBN. Importantly, TBN long ago stopped paying Peteski for Dr. Phil's services and he has thus been providing world class programs without compensation.

5.      Under the Joint Venture Agreement, Peteski agreed to provide Merit Street with certain new original episodes of the Dr. Phil show, as well as primetime specials to air on the new TV network. For its part, TBN agreed to provide, *at no cost to Merit Street*, carriage to distribute Dr. Phil's shows and specials to a nationwide audience. TBN also agreed to provide all "first class quality" services necessary to produce Dr. Phil's shows and primetime specials. In short, the deal was simple and straightforward:  Dr. Phil/Peteski contributed content, while TBN contributed

access to a distribution network to air Dr. Phil's content along with the production services to support the creation of that content. TBN agreed to provide these services to the joint venture at no cost, in exchange for which TBN would have a controlling equity interest in the network.

6.      Shortly after Merit Street was formed, however, TBN reneged.  It began to abuse its power as a controlling shareholder to advance its own interests and those of its CEO Matthew Crouch, while causing Merit Street to assume responsibility of TBN's obligations under the Joint Venture Agreement and to otherwise enrich itself at Merit Street's expense.

- TBN caused Merit Street to enter into expensive distribution agreements with third parties to distribute Dr. Phil's new content.  Those distribution agreements have aggregate monthly expense of approximately $2.6 million and total expenses during the life of those agreements of approximately $96 million.  However, it was TBN—not Merit Street—that should have incurred those expenses.

- TBN caused Merit Street to sign a five-year, multi-million-dollar studio lease *with TBN* to produce Dr. Phil's shows, even though TBN was responsible under the Joint Venture Agreement for paying for those studio production expenses.

- TBN caused Merit Street to pay to license TBN content on the new Merit Street network, even though the Joint Venture Agreement required TBN to license that content at no cost to Merit Street.

- TBN also caused Merit Street to pay TBN for Merit Street's production expenses, such as employee and marketing expenses, even though those production expenses were the sole responsibility of TBN under the Joint Venture Agreement.

7.      TBN's "production services" were also comically dysfunctional. Although it promised the equivalent of the professional facilities and services that Dr. Phil had long relied on when producing his show in Los Angeles for CBS, the supposed "first class" services TBN promised under the Joint Venture Agreement were nothing of the sort.  TBN provided screens and teleprompters that blacked out during live shows, an incomplete control room operating out of a truck, an unusable cell phone app for viewers, and amateur video editing software.  Merit Street staff often could not even make phone calls in the studio due to poor cell coverage.  When confronted about these and many other problems, TBN did not even attempt to remedy its

breaches.  Instead, TBN's CEO dismissed these concerns by telling Merit Street that Dr. Phil only needed two chairs and a camera.

8.      Additionally, TBN caused CrossSeed, Inc ("CrossSeed")—a party with whom TBN is closely connected—to make a $25 million loan to Merit Street, which is reflected in a September 2024 promissory note.  CrossSeed's directors include TBN President and CEO Matthew Crouch and former TBN Chief Business Officer Frank Amedia.

9.      CrossSeed then assigned that note to another associated party, TCT, on March 5, 2025.  TCT perfected the security interest granted pursuant to the note on May 27, 2025.  However, the transfer of the security interest to TCT is an avoidable preference because perfection occurred more than 30 days after CrossSeed transferred the note to it and within 90 days of the date Merit Street filed its petition.  Moreover, all of TBN and TCT's obligations should be equitably subordinated to Merit Street's other creditors due to TBN's gross misconduct.

10.     This adversary proceeding seeks to hold TBN accountable for its multiple breaches of contract and fiduciary duties that gravely impaired Merit Street's ability to succeed and ultimately led to its failure.  While Peteski has gone above and beyond to ensure Merit Street's success, including by continuing to loan on an *unsecured* basis over $25 million to Merit Street throughout 2024 and 2025 to keep its operations afloat, TBN has not held up its end of the bargain. TBN shirked its financial and operational commitments, and engaged in extensive self-dealing, all with the goal to benefit and enrich TBN, not Merit Street.

## JURISDICTION

11.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(a) and (b) and 11 U.S.C. § 157.

12.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

13.     The statutory bases for the relief requested herein are 28 U.S.C. § 2201 (the "Declaratory Judgment Act") sections 105, 365, and 541 of title 11 of the United States Code (the "Bankruptcy Code"), and Bankruptcy Rule 7001.

## PARTIES

14.     Plaintiff Merit Street is the debtor-in-possession in the above-captioned chapter 11 case the ("Chapter 11 Case").  The Debtor is authorized to continue to operate its business and manage its properties as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

15.     Defendant Trinity Broadcasting of Texas, Inc. is a not-for-profit corporation that operates the Trinity Broadcasting Network, based in Forth Worth, Texas.  TBN produces its own original Christian programs and also broadcasts those Christian programs as well as other Christian programming in the United States and internationally.

16.     According to TBN, "TBN is the world's most-watched faith and family broadcasting network, available in 98% of U.S. households, reaching over 175 nations with inspirational programming in 17 languages on over 30 global networks, allowing TBN to reach a potential 2 billion viewers daily." TBN's programming is available over-the-air on numerous television stations that TBN owns, directly or through its subsidiaries.  Through carriage agreements, TBN's programing and networks are also available through traditional cable and satellite companies and online streaming.

17.     American televangelist Paul Crouch and his wife Jan Crouch founded TBN in late 1973.  Today, TBN is overseen by its President and CEO Matthew Crouch (Paul and Jan's youngest son).

18.     Defendant TCT Ministries, Inc. is a not-for-profit corporation that operates the TCT Network, based in Marion, Illinois.   Like TBN, TCT produces and broadcasts Christian programming.   TCT programming is available on local television stations over-the-air or through traditional cable and satellite companies and online streaming.   On information and belief, from the mid-1980s until 2007, TCT was an affiliate of TBN, and also currently maintains a relationship with TBN.

## **BACKGROUND**

### A.     **TBN And Peteski Form Merit Street.**

19.     Dr. Phil has been one of the most prominent television personalities, podcast hosts, and authors for the past twenty-three years.   Dr. Phil created Peteski Productions, Inc., a Texas corporation, in 2002.   Beginning in 2002, Dr. Phil hosted his talk show *Dr. Phil*, with Oprah Winfrey's Harpo Productions and CBS Media Ventures ("CBS").   He was prepared to continue the highly successful program with CBS until Mr. Crouch approached him about the prospects of a Joint Venture which eventually became Merit Street.   Mr. Crouch made many promises following due diligence trips to Los Angeles to see the quality of the world class production facilities and to solicit Peteski and Dr. Phil.

20.     Once Peteski agreed to the deal, there was significant dislocation for Dr. Phil personally who moved from Los Angeles, as well as many staff members of *Dr. Phil* who likewise relocated.   In January 2023, CBS announced the Dr. Phil show would be ending after its 21st season.

21.     As of January 10, 2023, Peteski and TBN executed the Joint Venture Agreement to form a joint venture, "NewCo," which later would become Merit Street—through which Peteski

and TBN would launch a new television network in 2024.[2]  Under the Joint Venture Agreement, ownership of Merit Street would be allocated 70% to TBN, and 30% to Peteski.

22.    Under the Joint Venture Agreement, Peteski agreed to provide new, topical programming—specifically, 160 new ninety-minute episodes of the "Dr. Phil" show, and further, agreed that Merit Street would serve as the exclusive broadcaster of those Dr. Phil shows. Additionally, Peteski agreed to provide two primetime specials or documentaries for Merit Street to air on the new network.

23.    For its part, under the Joint Venture Agreement TBN assumed full responsibility for all behind-the-scenes operations to produce Dr. Phil's programming.  Specifically, TBN agreed in the Joint Venture Agreement to provide "[a]ll production services associated with 'Dr. Phil' programming."  It further agreed that its production services would be "first class quality," in a "comparable manner to the quality of other ... syndicated television programming."  For example, the Joint Venture Agreement required TBN to provide Merit Street with the following production services necessary for Dr. Phil's programming:

    i)  actual production and editing of all episodes,

    ii)  dedicated hair and make-up artist,

    iii) all wardrobe expenses,

    iv) administrative personnel,

    v)  legal personnel,

    vi) human resources personnel,

    vii) sales personnel,

---

[2] In February 2023, TBN formed APG Ventures, Inc. as a Delaware corporation to serve as the "NewCo" referenced in the Joint Venture Agreement.  APG Ventures, Inc. changed its name to Merit Street Media, Inc. in March 2024.  In February 2025, Merit Street re-incorporated in Texas.

viii) insurance,

ix) ad campaigns and public relations,

x)  travel and entertainment expenses,

xi) expenses relating to COVID protocols and mandates, and

xii) promotional and marketing and any and all other functions customarily associated with a full scale, top level production, above and below the line.

24.     Under the Joint Venture Agreement, TBN also agreed to "license all TBN content to" Merit Street.

25.     Critically, TBN also agreed under the Joint Venture Agreement to distribute Merit Street's programing at no expense to Merit Street.  TBN, directly or through its affiliates, owns dozens of local television stations throughout the country.  Those stations have exercised their "must carry" rights—meaning they *require* cable operators serving their geographic market to carry their signals at no cost.  This ensures that the TBN-owned local stations are distributed to widespread audiences.  TBN also has the right to broadcast its national networks with national satellite providers DISH and DirecTV.

26.     TBN agreed under the Joint Venture Agreement to distribute Merit Street's content through TBN's extensive national footprint, including via its local stations' must carry rights.  This unequivocal guarantee that it would provide distribution to Merit Street on a national basis was a linchpin of the deal.

27.     The arrangement and division of responsibilities under the Joint Venture Agreement made sense and played to the parties' strengths.  Peteski and Dr. Phil focused on content creation, while TBN provided the production services and distribution network required to launch and sustain a successful a new television network.

**B.    Merit Street Launches MeritTV.**

28.    On February 20, 2024, Merit Street announced that it had "successfully completed agreements to establish the Merit Street Media television network as a fully distributed, cable, satellite, and free over-the-air broadcast media brand."  Merit Street further announced:  "With commitments already exceeding 65 million television homes and pending agreements set to significantly expand that number, Merit Street, in partnership with Trinity Broadcasting Network, is poised to become one of the most widely distributed startup networks in modern history."  The feature program of the network would be Dr. Phil's new program, "Dr. Phil Primetime."

29.    On April 2, 2024, Merit Street officially launched a new television network called MeritTV.  At the outset, Merit Street included three original programs: Morning on Merit Street, The News on Merit Street, and Dr. Phil Primetime.

**C.    TBN Abuses Its Power As The Controlling Shareholder.**

30.    From the get-go, TBN abused its power as the controlling shareholder to cause Merit Street to pay for TBN's obligations and to otherwise enrich itself at Merit Street's expense. It also failed to deliver on its obligations under the Joint Venture Agreement to ensure that MeritTV became a successful network.

1.    TBN fails to distribution Merit Street content through its distribution network and instead negotiates expensive distribution agreements in Merit Street's name.

31.    To start, TBN did *not* distribute MeritTV and Dr. Phils' programming through its national footprint—as it was required to do under the Joint Venture Agreement.

32.    Instead, and without telling Merit Street or Peteski, TBN unilaterally developed a new distribution plan:  TBN inexplicably caused Merit Street to enter into agreements with local television stations, cable, and national satellite providers to broadcast Merit Street's content—at

considerable expense to Merit Street.  Merit Street's obligations under those agreements are approximately $96 million over the life of the agreements.

33.     Specifically, TBN unilaterally caused Merit Street to execute a series of nine programming license agreements with local television stations for the ability to broadcast Merit Street's programming on those local television stations.[3]  The terms of these licensee agreements had fees ranging from approximately $400,000 to $5.27 million annually and became the contractual obligations of Merit Street, not TBN.  This was a far cry from the *free* distribution that TBN promised under the Joint Venture Agreement.

34.     TBN also unilaterally caused Merit Street to execute distribution agreements with DirecTV and DISH, for DirecTV and DISH to distribute Merit Street's programming to its subscribers throughout the United States.  Those agreements again came at a substantial cost to Merit Street: *each* approximately $3.6 million per year.  TBN caused Merit Street to enter into those new contracts with DirectTV and DISH even though TBN's own national network already had distribution rights with those distribution platforms.

35.     Additionally, TBN caused Merit Street to enter into an agreement with Ocean Communications, LLC to grant Ocean a license to negotiate with third parties to achieve further distribution of the Merit Street network via Xfinity and Verizon Fios.  These agreements, too, came at a substantial cost to Merit Street—approximately $4 million total per year, depending on the number of Xfinity and Verizon Fios subscribers.

---

[3] These agreements include the following station groups and stations: CNZ Communications, LLC (WGBP, Atlanta); KAZT, LLC (KAZT, Phoenix); Caballero III, LLC (KGMM, San Antonio); Stryker Media LLC (KYVV, San Antonio); Stryker Media 2 LLC (KOFY, San Francisco); KVMD Licensee Co., LLC (KVMD, Los Angeles); Entravision Communications Corp. (WJAL, Washington, D.C.); Mountain Broadcasting Corp. (WMBC, New York); Cunningham Broadcasting Corp. (KTXD, Dallas; WYZZ, Peoria, Illinois; WATM, Johnston, Pennsylvania).

36.     Although TBN initially paid the distribution fees under the agreements for several months, soon TBN stopped paying those fees altogether.  TBN incorrectly asserted that Merit Street was responsible for these contractual obligations.  This is notwithstanding the fact that TBN has acknowledged, in a signed agreement, that these contracts are TBN's "sole responsibility" and a "TBN contractual liability."  The aggregate costs of these various agreements is approximately $2.6 million per month, with increased prices in future years, and approximately $96 million in total over the life of the agreements.

37.     Because TBN has failed to satisfy its payment obligations under these agreements, numerous distributors have discontinued Merit Street's broadcast signals, which has resulted in millions of households losing access to Merit Street's programming, including *Dr. Phil Primetime.* Merit Street has also received numerous breach notices, threatening damages and discontinuation of their broadcast signals.  On April 28, 2025, for example, Merit Street received a notice of breach regarding its agreement with Ocean Communications, LLC, and a second notice of breach on May 16, 2025.  On May 22, 2025, Merit Street received a notice of continuing default and intent to pursue legal remedies from a law firm on behalf of several of the stations groups with which Merit Street has agreements:  Stryker Media LLC, CNZ Communications SE, LLC, Caballero III, LLC, and Stryker Media 2 LLC.  On June 2, 2025, Merit Street received a similar letter from the same firm on behalf of KVMD TV LLC.  And on May 28, 2025, Merit Street received a Notice of Breach from Entravision Communications Corp.

38.     In total, TBN saddled Merit Street with approximately $96 million in contractual obligations that are the sole responsibility of TBN.

2.   <u>TBN improperly causes Merit Street to enter into a lease to use TBN's
production facilities.</u>

39.    On February 1, 2024, TBN caused Merit Street to enter into a five-year, multi-million-dollar lease *with TBN* to use TBN's studio space (the "<u>Plex</u>") to produce Dr. Phil's content. Under the lease agreement, Merit Street would pay TBN over $2.3 million per year for five years to use 27% of the "Plex."

40.    This is a classic example of self-dealing.  TBN did not even inform Merit Street's senior management that it was executing the lease with itself.  Instead, it caused TBN's General Counsel to sign the lease on Merit Street's behalf.

41.    When Merit Street's senior management eventually learned of the lease many months later, they were shocked.  TBN had agreed, as part of the Joint Venture Agreement that formed Merit Street, to provide "[a]ll production services associated with 'Dr. Phil' programming."  Nothing in the Joint Venture Agreement suggests that Merit Street would need to *pay TBN* to access its studio and production space.

3.   <u>TBN improperly charges Merit Street to license TBN's content</u>.

42.    Although the Joint Venture Agreement required TBN to license all TBN content to Merit Street at no cost, TBN improperly caused Merit Street to pay millions of dollars for TBN's content—some of which never even aired on MeritTV.

4.   <u>TBN improperly charges Merit Street for production services.</u>

43.    The grift did not stop there.  TBN improperly charged Merit Street for production services TBN had an obligation to provide under the Joint Venture Agreement.

44.    The September 2024 balance sheet that TBN prepared on behalf of Merit Street reflect a "Notes Payable" liability to Merit Street in favor of TBN of $132,994,750.  TBN has claimed that this note payable is for personnel and other costs incurred by TBN on behalf of Merit

Street.  TBN later claimed that the note payable had grown to $140 million.  TBN never provided, despite repeated requests, an accounting or breakdown of the expenses included in this $140 million note payable.  "We don't do that," TBN's Vice President of Finance stated.

45.     The financial statements for Merit Street that TBN prepared while it was the controlling shareholder of Merit Street also reflect millions of dollars in expenses charged to Merit Street and paid to TBN and third parties for production services that TBN expressly agreed in the Joint Venture Agreement to provide.  As just one example, the July 2024 income statement shows year-to-date marketing expenses of over $2 million.  But the Joint Venture Agreement expressly stated that TBN would be responsible for all "[p]romotional and marketing" expenses of Merit Street.

**D.     TBN Provides Shoddy Production Services.**

46.     As soon as Merit Street began producing content it quickly became apparent that TBN's contractual promises for a state-of-the-art "first class quality" production facility and services were empty.  For example:

- The teleprompters suffered from frequent malfunctions, including blackouts during live Dr. Phil episodes before studio audiences.

- The control room was incomplete, so operations ran out of a temporary setup in a truck rather than in a control room for over a year.  The truck-based control group had about one third of the functionality of an industry standard control room and, unlike the standard setup, could not run multiple productions simultaneously.  To make matters worse, the control room's monitors and communication systems malfunctioned frequently.

- TBN promised state-of-the-art editing software, but instead provided only Adobe Premier, a basic tool used by entry-level video editors.  During its previous 21-season run, Dr. Phil's show used an advanced program called Avid.  The downgrade led to substantial wasted time and an inferior product.

- Internal studio screens showing the stage from other rooms—including the greenroom where Dr. Phil's guests waited before going on air—malfunctioned, preventing guests, producers, and support staff from watching an ongoing production in real time.  This hindered production and forced guests to take the stage blind and without context of

what preceded their segments.  Production staff resorted to sharing screens because there were too few working ones to go around.

- TBN did not have an industry-standard system for tracking viewership.  It had no Nielsen Ratings and Merit Street was never able to obtain audience metrics.

- The touch screens used for film editing at the studio were nonfunctional, which hindered the editing of footage and degraded final productions.  These included the three primary screens Dr. Phil had been used to using for decades.  The screens TBN provided struggled to perform basic tasks such as starting and stopping video, rearranging images, and calling up text.

- The Merit Street cell phone app, an important direct-to-consumer tool, was basically unusable.

- Cell phone service in the studio was often so poor that Merit Street staff could not make calls.

- TBN did not provide enough engineers to address the many technical glitches that arose during productions.  This required Merit Street staff to compensate for TBN's deficient service through workarounds that involved using hardware and software in ways they were not designed to be used.  The time required for even basic production tasks soared.

47.    These glaring problems became apparent as soon as rehearsals for Dr. Phil Primetime began in early 2024.  On a daily basis, Merit Street raised the issues with TBN.  The reply was always the same: in effect, "don't worry about it, we'll handle it."  But TBN did not handle it.  The problems persisted.

48.    Indeed, TBN CEO Mr. Crouch dismissed Merit Street's requests for the industry-standard service to which it was contractually entitled as unreasonable demands for "bells and whistles."  If he had it his way, Mr. Crouch said, Dr. Phil Primetime's production would consist of two chairs in front of a single camera, and nothing more.  This is hardly the bargain the parties reached; it is not "first class quality," nor is it "comparable" to other syndicated television programming.

49.    There were other issues, too.  For example, despite contractually agreeing to provide "first class quality" promotional and marketing services, TBN's marketing and PR

contributions were lackluster—limited to just minimal social media advertising at the time of the Merit Street launch and one other social media campaign. TBN designed those limited social media efforts so that TBN itself would benefit by ensuring that a TBN entity would receive payment for the advertising.

### E.    The TBN And Peteski Relationship Breaks Down.

50.    TBN and Peteski's relationship reached a new low in July 2024, when TBN failed to make a $5 million payment owed to Peteski under the Joint Venture Agreement.

51.    Shortly thereafter, in August 2024, Peteski and TBN agreed to amend the stock purchase agreements that each company had entered into in March 2024 whereby TBN had acquired a 70% ownership interest in Merit Street and Peteski had acquired the remaining 30% ownership interest in Merit Street. The August 2024 amendment shifted Peteski's ownership interest in Merit Street to 70% with the remaining 30% owned by TBN.[4] Although the parties' ownership interest shifted, TBN remained obligated to provide all distribution and production services to Merit Street.

52.    Shortly after transferring 70% ownership of Merit Street to Peteski in August 2024, and after just four short months of MeritTV being on the air, TBN declared that it would cease all further support for Merit Street. TBN claimed it lacked financial resources to continue to support Merit Street—notwithstanding it reported assets of over $900 million in recent filings.

### F.    CrossSeed Issues $25 Million Convertible Promissory Note.

53.    In September 2024, Merit Street issued a $25 million convertible promissory note to CrossSeed (the "CrossSeed Convertible Note"). CrossSeed is a Texas non-profit corporation and, on information and belief, closely connected to TBN. The CrossSeed Convertible Note

---

[4] Currently, Peteski owns 66.5% of Merit Steet, TBN owns 28.5%, and SHG Partnership, LLC owns 5%.

converts to equity at a fixed Merit Street valuation of $425 million at the option of CrossSeed, exercisable only at the time of an equity raise of qualified financing. The CrossSeed Convertible Note purports to be secured, and bears interest a rate of 12% simple interest, payable on the maturity date of September 7, 2026.

54.     On March 5, 2025, CrossSeed assigned the note to TCT. On information and belief, TCT is closely connected to TBN. TCT filed a U.C.C. Financing Statement as a secured party on May 27, 2025.

**G.     The Parties Attempt—And Fail—To Salvage the Joint Venture.**

55.     By September 2024, it was becoming clear that TBN would never live up to its contractual obligations. Merit Street realized that in order to ensure its continued viability, it needed to resolve its outstanding disputes with TBN. To that end, the parties entered negotiations.

56.     The parties' negotiations culminated in a December 9, 2024 Outline of Proposed Terms ("December 2024 Agreement"). In the December 2024 Agreement, TBN, Peteski and Merit Street "agree[d] to negotiate in good faith to reach definitive agreements addressing the issues outlined here as promptly as practical, and with the common goal of singing such definitive agreements prior to December 31, 2024." In the December 2024 Agreement, the parties also reached a resolution on a number of definite terms to document in the definitive agreements, and agreed that the definitive agreements would supersede and replace the Joint Venture Agreement. The definite terms upon which the parties agreed, included:

- **_The Plex Lease_**. TBN agreed to abate 45 months of rent.

- **_Shared Facilities_**. TBN agreed that it would grant Merit Street access to other studio areas in the Plex.

- **_$140 Million Note Payable_**. TBN agreed that Merit Street would not be responsible for paying TBN the purported $140 million note payable that TBN caused Merit Street to record.

- ***Prior Services***. TBN agreed that TBN would reverse charges to Merit Street for prior services provided by TBN to Merit Street.

- ***Administrative Service Expenses***. TBN agreed that it would supply numerous administrative staff to Merit Street, including for accounting, payroll, billing, human resources, information technology services, technology support, and engineering.

- ***Payments to Peteski***. TBN agreed to pay Peteski amounts owed.

- ***License and Distribution Agreement Costs***. TBN acknowledged that "[t]he contractual costs of [Merit Street's] current distribution agreements are the sole responsibility of TBN"—averaging about $2.6 million per month.  Merit Street had paid, on TBN's behalf, approximately $13 million under these contracts.  While the agreement stated that TBN maintained it was not in a position to pay those expenses, it acknowledged the "significant hardship and inequity for [Merit Street] to be servicing a TBN contractual liability," and agreed that it would reimburse Merit Street for these payments and assume current payments as it was able.  Merit Street agreed to continue to make payments "subject to ultimate repayment by TBN."

57.    The December 2024 Agreement reflected the very same terms to which TBN had agreed and failed to abide by in the Joint Venture Agreement.  In other words, TBN was responsible for providing distribution and production services to Merit Street at no cost to Merit Street.

58.    Peteski immediately set out to prepare draft agreements based on the terms of the December Term Sheet.  But then TBN abruptly stated that it would not honor the signed December 2024 Agreement.  Instead, TBN proposed entirely new terms, which were unworkable and unacceptable to Merit Street.

59.    All the while, the quality of TBN's already poor production services continued to decline.  Earlier this year, a senior TBN executive admitted that TBN was doing only the bare minimum for Merit Street.  He sought to justify TBN's position by baselessly characterizing Dr. Phil's unchanged desire for first-class service as "unpredictable" expectations.  Other TBN staff followed this executive's example by insinuating that meeting TBN's obligations to Merit Street wasted TBN's scarce resources.

60.     Moreover, TBN defaulted on an additional $25 million in payments due to Peteski, and continues to refuse to pay for the license and distribution agreements it caused Merit Street to enter.

**H.      Peteski And Dr. Phil Take Steps To Keep Merit Street Afloat.**

61.     Even though TBN refused to honor its commitments to Merit Street and refused to pay Peteski the amounts it was owed, Peteski and Dr. Phil continued to support Merit Street to keep it afloat.

62.     Between December 2024 and May 2025, Peteski advanced additional funds to Merit Street, totaling approximately $25.4 million.  Specifically, on February 28, 2025, Merit Street issued to Peteski a convertible promissory note, pursuant to which Peteski purchased approximately $11,407,166 of aggregate principal amount of convertible notes.  And on June 1, 2025, Merit Street issued to Peteski a convertible promissory note, pursuant to which Peteski purchased approximately $14 million of aggregate principal amount of convertible notes.  These convertible notes issued by Peteski convert to equity at the valuation of the next equity raise.

63.     Additionally, on June 30, 2025, Peteski agreed to enter into an agreement with Merit Street, effective June 10, 2025, whereby Peteski agreed to issue a secured bridge loan of $6,996,636.

64.     In total, to date—due to TBN's breaches of the Joint Venture Agreement—Peteski has loaned over $25 million to Merit Street.

<u>**COUNT I**</u>
**(Breach of Contract ("Joint Venture Agreement") Against TBN)**

65.     Merit Street incorporates the allegations set forth in the foregoing paragraphs as if set forth in full below.

19

66.     As of January 10, 2023, Peteski and TBN executed a valid contract, the Joint Venture Agreement.

67.     Merit Street is a third-party beneficiary to the Joint Venture Agreement between Peteski and TBN.  The Joint Venture Agreement was intended to benefit Merit Street directly and under the agreement TBN owes contractual duties directly to Merit Street.

68.     Merit Street fully performed its obligations as a third-party beneficiary under the Joint Venture Agreement.

69.     As alleged herein, TBN breached its obligations under the Joint Venture Agreement, including by failing to meet its obligations to provide production and distribution services to Merit Street and causing Merit Street to pay or incur obligations that were the responsibility of TBN.

70.     As a direct and proximate result of TBN's breaches of the Joint Venture Agreement, Merit Street suffered and continues to suffer significant damages, including monetary damages.

### COUNT II
### (Breach of Covenant Of Good Faith And Fair Dealing
### (Joint Venture Agreement) Against TBN) (In the Alternative)

71.     Merit Street incorporates the allegations set forth in the foregoing paragraphs as if set forth in full below.

72.     As of January 10, 2023, Peteski and TBN executed a valid contract, the Joint Venture Agreement, and Merit Street is a third-party beneficiary to the Joint Venture Agreement.

73.     TBN has an obligation to perform its obligations under the Joint Venture Agreement fairly, honestly, in good faith, and in a manner that does not deprive Merit Street of the benefits and overarching purpose of the agreement.

74.    Merit Street fully performed its obligations as a third-party beneficiary under the Joint Venture Agreement.

75.    To the extent that TBN's obligations to provide distribution and production services were not identified specifically in the Joint Venture Agreement, TBN breached the covenant of good faith and fair dealing by depriving Merit Street of the benefit of the Joint Venture Agreement, which was for TBN to provide production and distribution services to Merit Street at no cost to Merit Street.

76.    As a direct and proximate result of TBN's breaches of the implied covenant of good faith and fair dealing, Merit Street suffered and continues to suffer significant damages, including monetary damages.

## COUNT III
**(Breach of Contract (December 2024 Agreement) Against TBN)**

77.    Merit Street incorporates the allegations set forth in the foregoing paragraphs as if set forth in full below.

78.    On December 9, 2024, Merit Street, Peteski, and TBN entered into the binding December 2024 Agreement.  In the December 2024 Agreement, the parties agreed on certain definite terms relating to the operation of Merit Street. The December 2024 Agreement is a complete and enforceable agreement with respect to these definite terms. The December 2024 Agreement also contained a binding agreement to "negotiate in good faith to reach definitive agreements addressing the issues outlined here as promptly as practical, and with the common goal of singing such definitive agreements prior to December 31, 2024."  The definitive agreements were to supersede and replace the Joint Venture Agreement, which is governed by Delaware law.

79.     Merit Street performed its obligations under the December 2024 Agreement, including by attempting in good faith to draft final agreements addressing the issues in the December 2024 Agreement.

80.     TBN breached its obligations under the December 2024 Agreement.  It failed to honor the definite terms contained in the December 2024 Agreement.  It also flatly refused to work in good faith to draft final agreements addressing the issues in the December 2024 Agreement. But for TBN's bad-faith conduct, final agreements would have been executed.

81.     As a direct and proximate result of TBN's breaches of the December 2024 Agreement, Merit Street suffered and continues to suffer significant damages, including monetary damages.

## <u>COUNT IV</u>
### (Breach of Fiduciary Duty Against TBN)

82.     Merit Street incorporates the allegations set forth in the foregoing paragraphs as if set forth in full below.

83.     As alleged herein, TBN exercised control over the affairs of Merit Street and owned 70% of Merit Street through August 2024.  TBN owed Merit Street fiduciary duties, including duties of loyalty and care.

84.     As alleged herein, TBN breached its fiduciary duties to Merit Street, including by engaging in self-dealing and other gross misconduct to advance its own interests at the expense of Merit Street.

85.     As a direct and proximate result of TBN's breaches of its fiduciary duties, Merit Street suffered and continues to suffer significant damages, including monetary damages.

## COUNT V

**(Declaratory Judgment For Preference Avoidance Regarding CrossSeed Convertible Note Under 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57 Against TCT)**

86.     Merit Street incorporates the allegations set forth in the foregoing paragraphs as if set forth in full below.

87.     This claim for relief arises under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

88.     In September 2024, Merit Street issued a $25 million convertible promissory note to CrossSeed.

89.     Pursuant to Section 4 of the CrossSeed Convertible Note and in consideration for such note, Merit Street (i) granted to CrossSeed a security interest in all of Merit's personal property, instruments, accounts, money, deposit accounts, securities and all other investment property, contract rights or rights to the payment of money, insurance claims and proceeds, and all general intangibles, and (ii) authorized the holder of the CrossSeed Convertible Note to prepare and file a financing statement to perfect the holder's security interest.

90.     On March 5, 2025, CrossSeed assigned the CrossSeed Convertible Note to TCT.

91.     On May 27, 2025, TCT perfected its security interest in the CrossSeed Convertible Note by filing a UCC-1 Financing Statement as a secured party with the Secretary of State of Texas.  TCT did not perfect with respect to litigation proceeds, which are not mentioned in its UCC-1 Financing Statement.

92.     Under 11 U.S.C. § 547(e)(2), the transfer of an interest of the debtor in property—including the transfer of a security interest—is made at the time such transfer is perfected, where the transfer is perfected more than 30 days after the transfer was made.

93.     Here, TCT perfected its security interest more than 30 days after CrossSeed transferred to it the CrossSeed Convertible Note, so the transfer is deemed to occur on the date of perfection, May 27, 2025.

94.     May 27, 2025 is within Debtor's preference period because it is within 90 days of the date Merit Street filed its bankruptcy petition (July 2, 2025).

95.     Accordingly, this Court should issue an order declaring that the transfer is an avoidable preference under 11 U.S.C. § 547(b).  In addition or in the alternative, this Court should issue an order declaring that TCT has no perfected security interest in Merit Street's litigation proceeds.

### COUNT VI
**(Declaratory Judgment for Equitable Subordination of the under 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57 Against TBN and TCT)**

96.     Merit Street incorporates the allegations set forth in the foregoing paragraphs as if set forth in full below.

97.     This claim for relief arises under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

98.     Equitable subordination is a remedy that allows a court to subordinate a creditor's claim to other claims as a result of misconduct by that creditor.  *In re Equip. Equity Holdings, Inc.*, 491 B.R. 792, 840 (Bankr. N.D. Tex. 2013).  This remedy is properly granted when (1) the claimant engaged in inequitable conduct; (2) the misconduct resulted in injury to debtors or other creditors, or conferred an unfair advantage to the claimant; and (3) equitable subordination of the claimant's claim is not contrary to other provisions of the Bankruptcy Code.  *Id.* at 841–42.  Further, conduct is inequitable if it involves or is the result of breaches of fiduciary duties.  Additionally, if the claimant is an insider, courts scrutinize that claimant's conduct more rigorously.

99.     As alleged above, TBN breached fiduciary duties it owed to Merit Street, including by engaging in self-interested transactions that depleted Merit Street's capital.  TBN then caused a $140 million liability to be recorded on Merit Street's balance sheet in favor of TBN.   Further, because TBN caused Merit Street to pay TBN and others money that TBN itself should have paid, Merit Street was forced to borrow an additional $25 million from CrossSeed in September 2024, which note was later assigned to TCT.  That $25 million contribution was only made necessary by TBN's breaches of fiduciary duty.

100.    This inequitable misconduct resulted in harm to Merit Street and its other creditors.

101.    Equitable subordination would not be contrary to other provisions of the Bankruptcy Code.

102.    Further, the Fifth Circuit and courts within it have equitably subordinated claims of even a secured party after finding that party engaged in wrongful conduct, as TBN has here.  *See, e.g.*, *In re Matter of Fabricators, Inc.*, 926 F.2d 1458 (5th Cir. 1991) (equitably subordinating otherwise secured lender's claim to unsecured status where, among other conduct, insider's exercise of control over debtor to allow insider to obtain a lien on debtor's assets); *In re Adv. Modular Power Sys., Inc.*, 413 B.R. 643, 676–77 (Bankr. S.D. Tex. 2009) (equitably subordinating claim to lower priority than other unsecured creditors based on insider's action in self-interest to deplete the debtors of their most profitable business).  Because TBN has exerted improper control over Merit Street to solely further its own interests at the expense of Merit Street, including by causing its affiliate to issue a loan to Merit Street, any claims of TBN and TCT should be equitably subordinated.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, the Debtors respectfully request that upon final hearing, a judgment be entered

as follows:

A.    Awarding Merit Street damages suffered as a result of TBN's breach of the Joint Venture Agreement and December 2024 Agreement, including prejudgment interest and punitive damages.

B.    Awarding Merit Street damages suffered as a result of TBN's breach of its fiduciary duties, including prejudgment interest and punitive damages.

C.    Entering judgment in favor of Merit Street and declaring that the March 5, 2025 transfer of the CrossSeed Convertible Note to TCT is an avoidable preference under 11 U.S.C. § 547(b), and, or in the alternative, that TCT has no perfected security interest in Merit Street's litigation proceeds.

D.    Entering judgment in favor of Merit Street and declaring that the CrossSeed Convertible Note should be equitably subordinated under Section 510(c) of the Bankruptcy Code;

E.    Granting Merit Street its attorneys' fees and costs; and

F.    Granting Merit Street such other and further relief as the Court may deem just and proper.

Dated:  July 2, 2025
Dallas, Texas

/s/ Jeri Leigh Miller

**SIDLEY AUSTIN LLP**
Thomas R. Califano (24122825)
Jeri Leigh Miller (24102176)
Parker G. Embry (24126826)
Chelsea McManus (24131499)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:    (214) 981-3300
Facsimile:    (214) 981-3400
Email:        tom.califano@sidley.com
              jeri.miller@sidley.com
              parker.embry@sidley.com
              cmcmanus@sidley.com

*and*

James W. Ducayet (*pro hac vice* pending)
Steven E. Sexton (*pro hac vice* pending)
Andrew F. Rodheim (*pro hac vice* pending)
One South Dearborn
Chicago, Illinois 60603
Telephone:    (312) 853-7000
Facsimile:    (312) 853-7036
Email:        jducayet@sidley.com
              ssexton@sidley.com
              arodheim@sidley.com

*and*

Stephen Hessler (*pro hac vice* pending)
Patrick Venter (*pro hac vice* pending)
Weiru Fang (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:    (212) 839-5300
Facsimile:    (212) 839-5599
Email:        shessler@sidley.com
              pventer@sidley.com
              weiru.fang@sidley.com

*Proposed Attorneys for the Debtor
and Debtor in Possession*

## <u>Certificate of Service</u>

I certify that on July 2, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

*/s/ Jeri Leigh Miller*
Jeri Leigh Miller