**UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § § § | |
| MERIT STREET MEDIA, INC.[1] | § § | Chapter 11 |
| Debtor. | § § § | Case No. 25-80156 (SWE) |
| MERIT STREET MEDIA, INC. | § § | |
| Plaintiff, | § § § | |
| v. | § § | Adversary No. 25-08006-SWE |
| TRINITY BROADCASTING OF TEXAS, INC. and TCT MINISTRIES, INC. | § § § | |
| Defendants. | § § § § | |
| TRINITY BROADCASTING OF TEXAS, INC. | § § § | |
| Third-Party Plaintiff, | § § § | |
| v. | § § | |
| PETESKI PRODUCTIONS, INC. and PHILLIP C. MCGRAW | § § § | |
| Third-Party Defendants. | § § | |

**TRINITY BROADCASTING OF TEXAS, INC.'S ORIGINAL THIRD-PARTY
COMPLAINT AGAINST PETESKI PRODUCTIONS, INC. AND PHILLIP C. MCGRAW**

Third-Party Plaintiff Trinity Broadcasting of Texas, Inc. dba Trinity Broadcasting Network

("**TBN**" or "**Third-Party Plaintiff**") brings this *Original Complaint Against Third-Party*

---

[1] The last four digits of the Debtor's federal tax identification number are 8990. The Debtor's mailing address is 5501 Alliance Gateway Fwy, Fort Worth, Texas 76177.

Defendants Peteski Productions, Inc. ("**Peteski**") *and Phillip C. McGraw* ("**McGraw**," together

with Peteski, the "**Third-Party Defendants**") pursuant to Federal Rule of Bankruptcy Procedure

7001 (the "**Third-Party Complaint**").[2] In support of this Third-Party Complaint, TBN

respectfully shows the Court as follows:

## I.    INTRODUCTION

1.      As this Court explained in its August 18, 2025, *Order Granting Continuance and*

*Providing Ancillary Relief* [Bnkr. Dkt. 248], this dispute has been anything but "routine."  From

its inception, Peteski and McGraw orchestrated an untoward strategy by filing concurrently with

the bankruptcy case, an incendiary adversary proceeding against TBN and others and then

conditioning Peteski's DIP loan to debtor Merit Street Media, Inc. ("**Merit Street**" or the

"**Debtor**") on the court adjudicating one of the claims in this adversary proceeding in Peteski's

favor.

2.      Following the bankruptcy filing, TBN has methodically stated the course of events

that actually transpired between it, on the one hand, and Peteski, McGraw and their agents, on the

other hand, as set forth in TBN's motion to dismiss or convert the bankruptcy [Bnkr Dkt. 100], its

motion to dismiss the adversary proceeding complaint [Adv. Dkt. 47-48], and its answer [Adv.

Dkt. 49].

3.      The response to TBN legitimately and lawfully defending itself from Peteski and

McGraw's bad-faith attacks is to cry foul because they do not like the true facts that they

themselves now regretfully put at issue before this Court, revealing McGraw's true illicit intent

and wrongful conduct which he self-described as a "gangster move" and as "11th-hour poker."

---

[2] TBN files this Third-Party Complaint subject to and without waiver of any of the arguments
raised in its pending *Brief in Support of Motion to Dismiss Adversary Complaint for Declaratory
and Monetary Relief* [Adv. Dkt. 48].

4.      As detailed below, TBN now asserts its affirmative claims against Peteski and McGraw related to the years-long fraudulent scheme that they developed and executed to fleece TBN, a not-for-profit corporation, to enrich McGraw, his associates and affiliates. TBN is confident that the truth will set it free, and result in Peteski and McGraw being held accountable for their reprehensible conduct.

## II.      JURISDICTION

5.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

6.      This Third-Party Complaint relates to Merit Street Media, Inc.'s bankruptcy case, administered under case number 25-80156 (SWE), filed under chapter 11 of Title 11 of the United States Code, in the United States Bankruptcy Court for the Northern District of Texas (Dallas Division).

7.      Venue is proper before this District and Division pursuant to 28 U.S.C. § 1409(a).

8.      The statutory bases for the relief requested herein are 28 U.S.C. § 2201 (the "**Declaratory Judgment Act**") and Bankruptcy Rule 7001.

## III.      PARTIES

9.      Merit Street is the debtor-in-possession in the above-captioned chapter 11 case (the "**Chapter 11 Case**").

10.      Third-Party Plaintiff Trinity Broadcasting of Texas, Inc. is a Texas not-for-profit corporation with its principal place of business located at 13600 Heritage Parkway, Suite 200, Fort Worth, Texas 75177.

11.      Third-Party Defendant Peteski Productions, Inc. is a Texas corporation with its principal place of business located at 3001 Richmond Road, Suite B, Texarkana, Texas 75503.

Peteski Productions, Inc. may be served with process by serving its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

12.     Third-Party Defendant Phillip C. McGraw is a natural person residing in the State of Texas. Phillip C. McGraw may be served with process by serving him at ██████████ ████████, or wherever he may be found.

## IV.     FACTUAL BACKGROUND

### A.     The Parties.

13.     TBN launched in 1973 with one small UHF television station airing a few hours of simple but inspiring programming each night across the Los Angeles, California area. Since its humble beginnings more than fifty years ago, TBN has grown into the world's largest Christian television network and a leader in using innovative technology to reach more viewers around the world with programming that entertains, inspires, and changes lives in over 175 countries.

14.     In 2018, TBN decided to move its primary operations from California to Texas. In furtherance of the transition to Texas, TBN purchased a large, then warehouse, property in Fort Worth, Texas in 2021 to expand and centralize its programming production capabilities in Texas. This property came to be known as the Plex. TBN purchased the Plex and initially designed it to be used to continue producing its content – with no plans for any for-profit entity to operate in it and with no plans for any live studio audience.

15.     McGraw is a television personality, podcast host, and author. From 2002 to 2023, McGraw hosted the *Dr. Phil Show* syndicated primarily on CBS.

16.     Peteski, which is owned and controlled by McGraw, produced the *Dr. Phil Show* for years.

**B.        The Parties Agree to Form a New Network for McGraw's Programming.**

17.        Throughout the latter half of 2022, McGraw and an affiliated individual, Phil McIntyre ("**McIntyre**"), sought out TBN as a potential network to replace CBS as a producing and distributing partner for McGraw's show, making representations to TBN regarding the financial successes and on-going popularity of the *Dr. Phil Show*.

18.        McGraw specifically represented to TBN that he wanted to change networks because of what he perceived to be CBS's censorship of the content aired on the *Dr. Phil Show*. As McGraw put it, "I don't want snot nose lawyers telling me what I can and can't say on TV." McGraw also represented that he wanted to move his show from California to Texas to lower production costs by saving on employee payroll and outside service expenses and avoid onerous union hours and demands, and other California regulations. McGraw believed that the Plex could be the new home for the *Dr. Phil Show*.

19.        In or around January 2023, McGraw claimed that his contract with CBS was ending and that CBS would be presenting him with a new offer to renew his contract with the network, and he wanted to know whether TBN would consider entering into an alternative agreement so that he could terminate, rather than renew, his deal with CBS. To induce TBN into an agreement, Peteski, through McGraw, McIntyre, and others, reiterated numerous representations related to the then-current advertising revenue, product integrations, production costs, and viewership of the *Dr. Phil Show*. These representations turned out to be false. Specifically, Peteski, through McGraw, McIntyre, and others, misrepresented to TBN that:

    a.        CBS was selling out the advertising inventories for the *Dr. Phil Show* and the *Dr. Phil Show* received significant advertising revenue per show;

    b.        the new programming McGraw would create for TBN would be 90-minute shows, rather than the then-current 60-minute shows, in order to increase

overall advertising revenue created by additional available advertising spots on the 90-minute show format;

c.    advertising and other revenue together with cost cutting savings would easily cover the fees associated with any agreement McGraw and/or Peteski reached with TBN and would generate substantial profits for all parties even in the first year;

d.    the then-current approximately $68 million per year production costs for the *Dr. Phil Show* could—and would—immediately be reduced by at least 40 percent by (i) moving all related production activities from California to Texas; (ii) not bringing any current personnel associated with the *Dr. Phil Show* to Texas; (iii) eliminating unionized employees and benefits and reducing overall head count; and (iv) other cost saving measures;

e.    McGraw's viewership and advertisers were highly loyal to him and would follow him wherever he went; and

f.    McGraw owned the media library containing all his previously recorded programs, and the network he and/or Peteski would create with TBN would have access to this 21-year media library at no additional cost.

20.    McGraw intentionally created a false sense of urgency in this process to induce TBN to act quickly. Among other things, McGraw falsely represented to TBN that CBS would pay him $75 million per year to renew his contract and TBN must (1) immediately sign some form of binding agreement with Peteski and (2) immediately pay him $20 million as a gesture of good faith to show TBN's ability to pay and commitment to the deal. Anything less, McGraw claimed, would be a "deal killer." TBN relied on McGraw's false assurances and proceeded with the requested urgency.

21.    Within a matter of a few short days, TBN entered into a Binding Letter of Intent with Peteski on January 10, 2023 (the "**BLI**") and paid McGraw's company, Peteski, $20 million on January 12, 2023. A true and correct copy of the BLI is attached hereto as Exhibit A.

22.    TBN expected that its showing of good faith to McGraw would lead to the promised negotiation of formal agreements contemplated by the BLI. *See* Ex. A at § 11. Years of delay and

excuses lead to the inevitable conclusion that McGraw never intended to formalize the parties' agreement.

23.     The BLI called for the formation of a newly branded television network, tentatively named "NewCo." *Id*. at § 1. "Newco" eventually became known as Merit Street Media which, pursuant to the BLI, was owned 70% by TBN and 30% by Peteski.[3]

24.     The BLI described the parties' respective obligations. Most pertinent among them, TBN would provide production and distribution services to Merit Street. *Id*. at § 4. Peteski, in turn, was obligated to provide "new content," including "160 (90 minute) new, topical episodes of the show 'Dr. Phil' (the 'Show') delivered over 24-27 production weeks, as needed.[4] *Id.* at § 5. For that, McGraw (through Peteski) would receive a whopping $50 million per year for ten years—a total of $500 million, if (and only if) Peteski and McGraw performed.

25.     Despite McGraw's current false claims that TBN was to pay for everything related to Merit Street, the BLI expressly sets forth what TBN was to provide to Merit Street, Peteski, and/or McGraw "at no cost." *See, e.g., id.* at §4(c) (TBN will pay the "cost" for McGraw to travel in a private plane). Merit Street was to pay for the other services provided by TBN at fair market value, as mandated by law for TBN as a non-profit corporation.

26.     Peteski was required to, among other things, "ensure that McGraw exclusively provide[d] the Show to [Merit Street]." *Id.* at § 8. From January 2023 through at least June 2024, Peteski and McGraw were represented by Manatt, Phelps & Phillips, LLP ("**Manatt**"). As further

---

[3]At McGraw's direction, TBN formed APG Ventures, Inc. ("**APG Ventures**"), a Delaware corporation, in February 2023 to serve as the "Newco" referenced in the BLI. APG Ventures changed its name to "Merit Street Media, Inc." in March 2024. To avoid confusion, TBN refers to the company as Merit Street in this Third-Party Complaint.

[4] "[A]s needed" refers to the number of production weeks needed (*i.e.* 24, 25, 26, or 27 production weeks), not the 160 90-minute episodes.

discussed herein, Manatt later established Envoy Media Co. ("**Envoy**"), a direct competitor of Merit Street, on behalf of Peteski and/or McGraw. On information and belief, Envoy was formed to fleece Merit Street of key employees and assets for McGraw's and Peteski's benefit, and that McGraw and Peteski caused Merit Street employees to perform services for Envoy by no later than June 2025.

**C.    TBN Successfully Launches Merit Street.**

27.    After signing the BLI on January 10, 2023, and paying Peteski $20 million two days later, TBN immediately began performing its obligations thereunder with the expectation that McGraw would negotiate in good faith and execute the long-form agreements contemplated by the BLI. But he never did.

28.    Beginning in February 2023, with McGraw still affirming to negotiate and execute the long-form agreements between Peteski and TBN called for by Section 11 of the BLI, TBN began making tenant improvements to the Plex to build a state of the art studio space for the filming and production of McGraw's new programming, including the 160 90-minute episodes he was required to make in the first year during the 24-27 production week schedule. Indeed, TBN and its employees built a space that was so impressive that McGraw described it in an interview as "the most state of the art news complex that … exists in the United States."[5]

29.    While the studio space was under construction, TBN worked on other aspects of the Merit Street endeavor per the BLI, including (a) negotiating the company's governing documents; (b) onboarding employees hired at the direction of Rich de Michele, McGraw's longtime Executive In Charge Of Production, and Joel Cheatwood, Merit Street's newly hired

---

[5]    *See*    https://vimeo.com/1103203562/9b6758030b    at    00:25-00:54;    *see also*
https://vimeo.com/1103203491/46ac018aa1;    https://vimeo.com/1103203503/0b7a8adc19;    and
https://vimeo.com/1103214993/5e89a9281c?share=copy; https://youtu.be/-j3tdBgSlSE.

Chief Operating Officer; (c) acquiring production and engineering equipment and resources specifically for McGraw's new show *Dr. Phil Primetime*; and (d) reviewing additional content, including TBN content, that could be aired on the network when it launched. During this time, TBN also accommodated new and increasing demands from McGraw and Peteski that were well outside the BLI and based in large part on McGraw's affirmative representations that once launched, the network would immediately start generating substantial revenue and that McGraw/Peteski would negotiate a long-form agreement.

30.    While TBN performed, McGraw did not. By way of example, even though McGraw had previously represented that he would substantially reduce production costs by eliminating all the high union salaries of the then-existing *Dr. Phil Show* personnel and would use TBN personnel or hire local Texans, McGraw instead caused Merit Street to hire dozens of existing employees from the *Dr. Phil Show* whom he claimed were "essential." By May 2023, McGraw's "essential" employees had ballooned to at least thirty individuals, many of whom were pre-existing union-based employees who were paid California union-based compensation and expected comparable union-type hours and benefits.

31.    On April 25, 2023, TBN hosted McGraw and his "essential" employees for a "planning rally" with key TBN personnel. The parties discussed Merit Street's broadcast schedule, which would be filled out with (1) pre-existing McGraw library content with updated introductions and exits, commonly referred to as "tops and tails" and (2) new TBN-produced programming and pre-existing TBN library content. This would be the plan until more original programming was produced or acquired.

32.    By June 2023, TBN expended more than $20.5 million toward Merit Street with no financial contribution from Peteski or McGraw. Indeed, McGraw refused to contribute the

approximately $9 million he owed to Merit Street for Peteski's 30% interest outlined in the BLI. This, among other things, prompted TBN to press McGraw to live up to his representation that he would contribute the *Dr Phil Show* library to Merit Street. Despite his previous representations, McGraw and his attorneys at Manatt informed TBN for the first time that McGraw would ***not*** contribute any old episodes of the *Dr. Phil Show* to Merit Street for Peteski's 30% or otherwise. Instead, McGraw brazenly demanded that TBN pay him $100 million to obtain a 50% interest in the media library.

33.    McGraw's reversal on this issue directly contravened his previous material representations which induced TBN to execute the BLI. Under the BLI, Peteski received a 30% ownership interest in Merit Street, plus compensation of $500 million over the course of ten years if Peteski performed its obligations under the BLI. Ex. A at §§ 1-2. In other words, that 30% interest was for McGraw/Peteski's combined contribution of capital and/or the media library to Merit Street, and the $50 million per year was compensation for the "new content" McGraw and Peteski were required to create exclusively for Merit Street, including the 160 90-minute episodes—none of which were ever made.

34.    McGraw's reversal of course had serious implications for TBN, Merit Street, Peteski, and McGraw. Without McGraw/Peteski's contribution of the media library or any material assets of value to Merit Street for its 30%, TBN was providing benefits to Merit Street, Peteski, and McGraw – and only owning 70% of Merit Street – without receiving anything of value in return. As TBN explained to McGraw and Manatt, as a non-profit corporation, TBN cannot do that. TBN cannot provide a benefit (*e.g.*, money, property, or services) to another if the value of the benefit exceeds the value of what the non-profit receives in return. Doing so, could expose TBN to an excise tax and possibly jeopardize its non-profit status. Recipients of any such benefit

(*i.e.*, Merit Street, Peteski, and McGraw) could also incur an excise tax on the benefit amount, be required to repay the excess to the non-profit, and potentially face IRS scrutiny and audits of other dealings.[6] In other words, TBN must receive fair market value for the use of its assets.

35.    Despite TBN making its full library of content available to be used to fill Merit Street's 24-hour a day broadcast schedule as needed, McGraw and/or the management team hired at McGraw's direction rejected most of the TBN programming. After refusing to allow Merit Street to broadcast any of McGraw's *Dr. Phil Show* library content and rejecting TBN's low-cost content, McGraw and Peteski instead insisted that Merit Street enter into expensive distribution deals with McGraw's friends, including Steve Harvey, Nancy Grace, the owner/producer of "Cops," Chris Harrison, and Lauren Zima, to TBN's (and Merit Street's) detriment.[7]

36.    Because Peteski and McGraw refused to honor the deal made with TBN, the funds TBN provided to Merit Street to fund its development and operations had to be treated as loans rather than capital investments, which resulted in a forced re-evaluation and re-adjustment of TBN's capital contribution to Merit Street being $7,000 for its 70% interest, and Peteski's capital contribution to Merit Street being $3,000 for its 30% interest. The actual stock purchase agreements executed by TBN and Peteski on March 5, 2024, to acquire Merit Street stock confirm this fact.

37.    Though frustrated by McGraw's conduct and the mounting expenses, TBN remained committed to making Merit Street a successful network and continued to believe that

---

[6] *See, e.g.,* https://people.com/how-was-brett-favre-involved-in-welfare-scandal-11737440.

[7] Notably, since initiating this Chapter 11 bankruptcy action, McGraw has announced that Harvey will be joining him at Envoy and McGraw has caused Merit Street to seek to reject its contract with Harvey's company (including Harvey's 5% stock holding with Merit), which would have the net effect of allowing McGraw to move Harvey from Merit Street to Envoy.

McGraw would cause Peteski to perform. Additionally, McGraw continued to make intentionally false statements to TBN representatives to induce TBN to continuing performing without the long-form agreements called for by the BLI. For example, McGraw failed to negotiate and/or act in good faith and continued to string TBN along on whether he would allow Merit Street to use any episodes of his library on Merit Street.

38.     Throughout 2024, TBN continued spending millions of dollars to make Merit Street a success, including (a) paying Peteski $5 million on January 2, 2024 and another $5 million on March 29, 2024; (b) building out and expanding the studio space for McGraw to use within the Plex; (c) building out office and personal space within the Plex for McGraw's exclusive use pursuant to McGraw's specific direction and specifications, including a helipad; (d) paying for even more "essential" employees hired by McGraw and his management team; and (e) allowing McGraw to use TBN's own studios, equipment, and facilities, to produce content for projects other than the 160 90-minute episodes the BLI required and other expenses, all of which were discussed with McGraw's and Peteski's lawyers at Manatt and properly recorded as debt.

39.     During this time, TBN also continued with the tedious process of negotiating and participating in the drafting of Merit Street's governing documents. Finally, on March 5, 2024, the parties executed multiple documents, including a Voting Agreement. A true and correct copy of the Voting Agreement is attached hereto as Exhibit B.

40.     The Voting Agreement provides for a three-person Board of Directors, with two members to be designated by TBN and one by Peteski. Ex. B at § 1.2. The Voting Agreement further provides that no director may be removed from office other than for cause unless the appointing shareholder (i.e., TBN or Peteski) directs or approves such removal. *Id.* at § 1.4. The three directors appointed on March 5, 2024 were: Matthew Crouch (a TBN designee), McGraw (a

Peteski designee), and Samuel Smadja (a TBN designee).[8] Most importantly, the Voting Agreement provides that it will terminate only in the event of: (a) a public offering of the company's stock; (b) "the consummation of a change of control transaction involving the transfer, acquisition or sale of at least a majority of the outstanding shares of capital stock of the Company;" or (c) termination by Merit Street or the holders of a majority of the company's stock, as set forth in Section 6.8 of the Voting Agreement. Ex. B at §§ 5, 6.8.

41.     Less than one month later and a little over a year after TBN and Peteski executed the BLI, Merit Street officially launched the Merit Street television network on April 2, 2024.

**D.      McGraw and Peteski Do Not Deliver.**

42.     After the launch of Merit Street in April 2024, McGraw required all additional distribution that were to be acquired for Merit Street be approved by and contracted for through members of Merit Street's management that he hired, specifically Joel Cheatwood. McGraw, Cheatwood, and others hired by them made virtually every decision about *Dr. Phil Primetime* (the name of the new content that McGraw and Peteski were to create for Merit Street) and the news operations such as when to record, where to record, what subjects to cover, what guests to invite, when each episode would air, and when to break into the schedule and go "live."

43.     Despite the time, work, and financial support TBN provided to successfully launch Merit Street and the resources TBN provided McGraw and Peteski to produce programming, it became clear that McGraw and Peteski could not deliver the viewership numbers, product integrations, or advertising revenues they previously promised to TBN.

---

[8] A true and correct copy of the Action of Sole Incorporator of APG Ventures, Inc. (the "**Director Designation**"), dated March 5, 2024, is attached hereto as <u>Exhibit C</u>.

44.    TBN expressed its disappointment with the lack of viewership, product integrations, and advertising to Peteski and McGraw. At that point in time, McGraw had not made any significant efforts to bring over product integrations or advertisers to Merit Street. In fact, McGraw apparently never made any introductions to the advertisers and product integrators that he had claimed would follow him wherever he went. When confronted about the lack of viewership, product integration, and advertising issues, McGraw admitted that his team had failed to live up to what was represented and expected and assured TBN that his team would make a better effort going forward.

45.    In or around June 2024, TBN met with Peteski and McGraw to reiterate that McGraw's lack of effort to bring product integrations and advertisers to Merit Street remained unacceptable. McGraw once again promised that his team would increase their efforts and do better. To try and keep programming costs down and capture McGraw's previous viewer base, TBN asked McGraw to reconsider his refusal to allow Merit Street to air old episodes of the *Dr. Phil Show*. Despite his pre-BLI representations and his failure to deliver any of the "160 (90 minute) new, topical episodes of the show 'Dr. Phil,'" McGraw refused.

46.    Because neither Peteski nor McGraw had contributed anything of value for Peteski's 30% ownership interest, the more than $100 million TBN had expended by the end of June 2024 on Merit Street had to be recorded as loans to Merit Street as discussed with Manatt. That amount continued to grow as TBN continued funding Merit Street's operations at the rate of $9 million to $13 million per month (recorded as more loans) under Peteski's and McGraw's direction and management (or lack thereof).

47.    Peteski and McGraw, on the other hand, had not produced a single 90-minute episode, let alone the 160 episodes required by the BLI, and based on its production schedules,

apparently had no intent to produce the "new content" required under the BLI in the remaining weeks on the production calendar.

48.     Because of Peteski's breach of the BLI and McGraw's failure to attract any significant advertisers, integrators, and viewers as promised, TBN advised Peteski and McGraw that it would not pay the monthly installment due on July 1, 2024, under the BLI or continue loaning Merit Street funds for its operations after August 31, 2024.

49.     In an effort to shift blame for their failures to TBN, Peteski and McGraw accused TBN of breaching its obligations under the BLI and not providing Peteski and McGraw with the resources they needed to produce content for Merit Street.

**E.      The Parties Explore Restructuring Merit Street.**

50.     After months of funding McGraw's ever increasing and never contemplated demands, as of June 2024, something had to change. To that end, in July 2024, TBN told McGraw that the blank check funding was coming to an end in August 2024.

51.     Unhappy with the prospect of the demise of his prized jewel, McGraw represented to TBN that he had a plan: to wit, give him ownership control of Merit Street and he would right the ship. On July 30, 2024, McGraw informed TBN that Peteski needed to acquire a majority-in-interest of the outstanding shares of Merit Street to solicit outside investments for Merit Street. According to McGraw, he had "friends and family" ready to invest tens of millions of dollars in Merit Street at a $425 million valuation of the company as soon as he could show them that he had a controlling interest in Merit Street. This became a common refrain from McGraw, including his repeated flaunting of the imminent investment in Merit Street. McGraw also stated to TBN that if the stock positions were swapped that he would make TBN's proposed 30% ownership worth more than it was at the current 70% ownership interest.

52.     On information and belief, McGraw's statements were intentionally false and made to induce TBN to take the actions, described below, that TBN would not have otherwise taken.

53.     Relying on McGraw's representations, TBN began negotiating with Peteski and McGraw a potential swap of its and Peteski's respective ownership positions in Merit Street. Notably, Jackson Walker LLP ("**Jackson Walker**") rather than Manatt represented Peteski and McGraw during these negotiations with TBN, and one of the Jackson Walker attorneys later claimed to be the general counsel of Merit Street.

54.     On August 1, 2024, TBN informed McGraw that it would be amenable to increasing Peteski's ownership share in Merit Street from 30% to 70% (thereby decreasing TBN's ownership share from 70% to 30%) subject to the parties addressing "a multitude of outstanding deal points to be finalized," including, among other things, recognition of the amounts TBN spent on Merit Street as secured loans, an amended lease for Merit Street's studio space at the Plex, and Peteski's and McGraw's agreement to fund all future Merit Street operational expenses.

55.     Over the next several days of negotiations, and because McGraw claimed he needed a signed paper showing he owned a controlling interest in Merit Street even while they continued to negotiate the material terms of any equity swap, the parties agreed to a multi-step process for Peteski to obtain a controlling ownership interest in Merit Street. The first step in that process was for the parties to prepare and execute a document that McGraw could present to his "family and friends" showing that he and/or Peteski owned a majority share of Merit Street's outstanding stock. Thereafter, the parties would continue to negotiate the outstanding deal points and memorialize them in formal agreements.

56.     Upon information and belief, McGraw never intended to perform any steps beyond the initial stock swap. Indeed—unbeknownst to TBN—McGraw described his plan on August 3,

2024, as a "gangster move" to reduce TBN to nothing more than "a passive minority investor role" in Merit Street.

57.     Like the negotiation and execution of the BLI, McGraw again created a false sense of urgency to induce TBN to take the actions McGraw wanted for his personal benefit and for the benefit of his company Peteski to the detriment of TBN.

58.     Based on McGraw/Peteski's repeated assurances to follow through with the remaining steps of the restructuring plan, TBN and Peteski executed the "Merit Street Stock Confirmation" (the "**Stock Amendment**") on August 8, 2024. A true and correct copy of the Stock Amendment is attached hereto as Exhibit D. The signing of the Stock Amendment was memorialized in a videotaped session.[9]

59.     The Stock Amendment purported to amend TBN's and Peteski's respective Common Stock Purchase Agreements signed on March 5, 2024. Specifically, the Stock Amendment provided that:

> The number of shares provided in the Stock Purchase Agreements which TBN shall purchase from [Merit Street] shall be reduced by 285,715 shares and the number of shares Peteski shall purchase from [Merit Street] shall be increased by 285,715 shares.

Ex. D at § 1.

60.     No consideration for this exchange appears on the face of the document. In other words, 40% of the outstanding shares were taken from TBN and given to Peteski, for which Peteski provided no value to TBN.[10] The consideration was to come later through the remaining steps of the restructuring process, which McGraw and Peteski prevented from happening.

---

[9] *See* https://vimeo.com/1110105386/b4feb8f5f6?share=copy.

[10] With Peteski's representation that Merit Street was valued at $425 million, this 40% stock transfer from TBN to Peteski would transfer $170 million of value to Peteski.

61.    The **_purported_** effect of this (invalid and fraudulent) exchange "shifted Peteski's ownership interest in Merit Street to 70% with the remaining 30% owned by TBN." Dkt. 1 at ¶ 51. Had TBN known this was nothing more than a part of McGraw's "gangster move" rather than the first step in an agreed upon multi-step process, TBN would not have signed the Stock Amendment.

62.    After signing the Stock Amendment, McGraw emailed TBN, recognizing that TBN and Peteski "have a pretty good 'to do' list to now turn our attention to" and reassuring TBN that he "did not forget [his] commitment to work diligently and expeditiously to get everything buttoned up post 'stock swap.'"

63.    In or about August 2025, McGraw also revealed to TBN that his initial "friends and family" investors included Harlan Crow and Darcy Ribman and/or Darcy Ribman's husband. McGraw further stated that the initial investors would be contributing $75 million into Merit Street by January 1, 2025 (the "**Outside Investment**"). McGraw also stated that Ken Solomon was talking to an investment group in New York and led TBN to believe that this group was going to be touring the Plex to see the operations and programming being produced.

64.    On information and belief, McGraw never intended "to work diligently and expeditiously to get everything buttoned up post 'stock swap'" or raise the promised capital from his "family and friends." Rather, McGraw's intention was to reduce TBN's role in Merit Street to nothing more than "a passive minority investor" and take over the company in what he characterized as a "gangster move."

65.    On August 25, 2024, McGraw emailed TBN regarding concerns he allegedly had about funding Merit Street's operations while he pursued new investors. In his email, McGraw asked TBN to continue funding Merit Street's operations through the end of 2024 and reiterated his promise to "forgive" TBN for any alleged breaches of the BLI and any future financial

obligations if TBN would help him "get through the next few months." McGraw claimed that without this money, Merit Street could not pay its bills, again attempting to falsely create a sense of urgency as part of his "11th hour poker" scheme.

66.     Though TBN would not directly continue loaning money to Merit Street, CrossSeed, Inc. ("**CrossSeed**"), a company now closely related to TBN, was convinced by McGraw and Peteski to loan Merit Street $25 million to fund its operations until January 1, 2025, on a fully secured basis, while McGraw sought to close further imminent funding from other potential investors. CrossSeed was willing to finalize the loan on an expedited bases so that Merit Street could, among other things, pay PBR millions of dollars in early September 2024. At the time, TBN expressed to McGraw that even with a loan of $25 million by CrossSeed at Merit Street's then-current monthly funding needs Merit Street would not be able to meet its obligations, to which McGraw responded that he could get the Outside Investment moved up and prior to the January 1, 2025, date he had previously stated.

67.     On August 31, 2024, McGraw sent TBN an email, stating that he would make the bill pay system "'same day' simple" and not force TBN to "wast[e] time" figuring out which vendors to pay once the financial systems and accounts were turned over to him on September 3, 2024. On information and belief, McGraw's statements were false and made to ensure that (a) CrossSeed would loan $25 million to Merit Street immediately, and (b) McGraw would have exclusive control over how that money was spent under the false guise of making things easier for TBN.

68.    On Monday, September 2, 2024, the day before Merit Street issued and executed a $25 million convertible promissory note (the "**Note**") to CrossSeed[11] (and Cross Seed funded the Note), McGraw wrote to CrossSeed and TBN asking them to keep the transaction "simple and as much outside any SEC jurisdiction as possible so as not to encumber any future fundraising which might occur inside a six-month window." In other words, McGraw did not want CrossSeed to record the Note. McGraw noted in his writing that the Jackson Walker attorney drafted the Note.

69.    On information and belief, McGraw either (a) did not want CrossSeed to record the Note because he believed it would impede his ability to convince others to invest in Merit Street; or (b) was already considering filing a bankruptcy action and did not want the Note recorded so he could later seek to fund Merit Street, pre- and post-bankruptcy, through loans from Peteski, and have those loans take priority over the Note.

70.    Just one day after CrossSeed funded the Note, Peteski and McGraw obtained control of Merit Street's bank accounts and removed TBN from the accounts. On that same day, McGraw confirmed his fraud (and intent to commit additional fraud) against Trinity when he wrote the following email to his insiders at MSM:

> We must make absolutely sure that no one at TBN is spending MSM money starting tomorrow…. They are very apt to go in there first thing in the morning and try and write a $3+ million check to PBR. We cannot let that happen. It is a powerful leverage tool that I have by informing them that the payment is being defaulted on because they failed to meet their deadline to fund $25 million on September 1 and now [it's] September 3. They need to figure out what to do.
>
> We aren't paying it because we can't pay it. We have to get our money out of there … we will not approve that PBR payment. Obviously they have to be paid but I'm playing some 11th hour poker here. TBN needs to pay PBR….

---

[11] The Note was later assigned to TCT Ministries Inc. ("**TCT**") on March 5, 2025, which is an affiliate of TBN. TCT perfected its security interest on May 27, 2025.

71.     During this time, TBN continued engaging in good-faith negotiations with McGraw and Peteski to address the remaining restructuring deal points and finalize the formal agreements that were conditions of the stock swap. Peteski and McGraw, however, did not. Indeed, McGraw regularly ignored or did not respond to TBN's efforts until he needed something from TBN.

72.     In November 2024, in another feigned rush, McGraw claimed he was about to close the major investment round he had been falsely touting for months. For example, on November 26, 2024, McGraw represented to TBN that he "[h]ad the call with investors and they definitely want us to get these [remaining deal points] buttoned up before they commit." However, the alleged obstacle now preventing the closing was the millions of dollars of debt on Merit Street's books owed to TBN because of Peteski's refusal to contribute capital or the *Dr. Phil Show* library to Merit Street. McGraw also revealed to TBN that the "friends and family" Outside Investment would also include Dirk Nowitzki. When questioned by TBN about how Mr. Nowitzki was involved in the "friends and family" Outside Investment, McGraw responded that he was McGraw's neighbor and that they played tennis together.

73.     According to McGraw, he needed a document he could show to these purported potential investors demonstrating that Peteski and TBN had "buttoned up" the remaining deal points. To address the problem McGraw claimed existed in closing the massive equity investment, TBN signed an "Outline of Proposed Terms" on December 9, 2024 (the "**December 2024 Outline**"). A true and correct copy of the December 2024 Outline is attached hereto as Exhibit E.

74.     As confirmed by its express language, the December 2024 Outline is nothing more than an agreement to later agree:

> This outline represents the good faith intent of [TBN, Merit Street, and Peteski] to negotiate binding definitive agreements embodying the terms outlined here. The Parties agree to negotiate in good faith to reach definitive agreements addressing the issues outlined here as promptly as practical, and with the

common goal of signing such definitive agreements prior to December 31,
2024. The definitive agreements, when executed by the Parties, will supersede
and replace in its entirety the [BLI] between TBN and [Merit Street].

Ex. E at p. 1.

75.     The December 2024 Outline goes on to address certain proposed changes to the

parties' relationship, such as the Plex lease, shared facilities, use of other studios, payments to

Peteski, adjustments to amounts charged to TBN, airtime allocation, and distribution costs. *Id.* at

pp. 1-2. The December 2024 Outline concludes with a section titled "Cooperation," which states

"MSM, Peteski, and TBN will work in good faith assisting TBN in its requirements regarding

meeting it[s] proper reporting duties and standards as a non-profit." *Id.* at p. 2.

**F.     The Parties' Negotiations Fail and Merit Street Files Its Bankruptcy Petition.**

76.     After execution of the December 2024 Outline, Peteski continued drafting formal

agreements. However, the terms included in the draft agreements prepared by Peteski's counsel

did not comport with the terms of the December 2024 Outline and completely discounted and

ignored the excess benefit issues raised by TBN and TBN's proper reporting duties and standards

as a non-profit. TBN proposed revised terms that Peteski and/or McGraw deemed "unworkable

and unacceptable to Merit Street." Dkt. 1 at ¶ 58.

77.     At the start of 2025 when the parties grew further apart in increasingly difficult

negotiations, Peteski saw one last chance to fleece TBN. With its cash reserves depleted by its

funding of Merit Street while Peteski and McGraw failed to deliver advertisers, viewers, or the

required new episodes, TBN listed its company airplane for sale in November 2024 for $17 million

to raise money to fund its own business needs and reduce its own overhead. TBN had not yet sold

its plane in February 2025. McGraw claimed he could take the plane, sell it, and provide funds to

fund Merit Street. In yet another artificially rush "deal," McGraw convinced TBN to "sell" the

airplane to Peteski. As soon as McGraw thought the deal was in hand, rather than converting the airplane to cash, he filed a flight plan to use the airplane to travel to New Orleans that week, presumably to attend the Superbowl. Thereafter, McGraw advised TBN that the Ribmans liked the airplane and were considering purchasing it. But, to TBN's knowledge, the aircraft has never been sold and is still in a McGraw controlled company in Europe.

78.    On or around February 19, 2025, apparently in recognition that he could no longer squeeze funds or assets out of TBN and that Merit Street needed material to air, McGraw finally caused Peteski to provide the complete 21-year *Dr. Phil Show* library to Merit Street in a transaction negotiated between Manatt and Jackson Walker.[12]

79.    Shortly thereafter, and without TBN's knowledge, McGraw and/or Peteski caused Merit Street to issue two convertible promissory notes to Peteski in the total amount of approximately $25.4 million on February 28, 2025 and June 1, 2025. Further, on June 30, 2025, and again without TBN's knowledge, Peteski issued a secured bridge loan to Merit Street in the amount of approximately $7 million.

80.    Two days after Peteski issued the bridge loan, Merit Street filed a voluntary petition for relief under the Bankruptcy Code. The filing came as a surprise to TBN because it still controlled two of the three directors on Merit Street's board and had not authorized the retention of Gary Broadbent, Merit Street's purported Chief Restructuring Officer, or approved the bankruptcy petition.[13]

---

[12]    *See*    https://www.manatt.com/insights/news/2025/manatt-represents-dr-phil-in-bringing-his-show-to-merit-tv-in-exclusive-streaming-deal.

[13]    As late as February 21, 2025, TBN confirmed in writing to Peteski and McGraw that Crouch and Smadja remained on the Merit Street board of directors.

81.     Attached to Merit Street's voluntary petition was an unsigned copy of the Resolutions of the Special Committee of the Board of Directors of Merit Street Media, Inc. (the "**Bankruptcy Resolutions**"), which purported to establish Merit Street's corporate authority to file the Chapter 11 Case. The Bankruptcy Resolutions state that on June 30, 2025, Merit Street's board (purportedly composed solely of McGraw) established a special committee and delegated to it the duties, rights, and authority set forth in a document called the Special Committee Charter.

82.     At the first-day hearings on July 3, 2025, Merit Street's counsel stated that Broadbent is the sole member of the Special Committee. Case No. 25-80156; July 3, 2025, Hr'g Tr. 7:20–23. And, Ms. Lansio, on behalf of Merit Street, testified that McGraw and Mr. Broadbent were the only members of Merit Street's Board of Directors.

83.     In its August 4, 2025 Statement of Financial Affairs, Merit Street represented that Peteski and/or McGraw purported to remove the two directors appointed by TBN on February 3, 2025. Dkt. 161. But no removal of the board members has taken place in accordance with the terms of the Voting Agreement.

84.     Any purported removal of Matthew Crouch or Samuel Smadja from Merit Street's board was ineffective and in violation of the Voting Agreement. TBN anticipates that McGraw and Peteski will argue that the Voting Agreement was terminated as a matter of course by the Stock Amendment. This cannot be true. In the relevant context, the Voting Agreement would have only terminated in accordance with its Section 5(b) if there had been a "consummation of a change of control transaction involving the transfer, acquisition or sale of at least a majority of the outstanding standing share of capital stock of [Merit Street]." Ex. B at § 5(b). The Stock Amendment—for which there was no exchange of consideration—only purportedly caused TBN to transfer 40% of its Merit Street stock to Peteski, which is not a transfer of a majority.

G.    **McGraw and Peteski Raid Merit Street to Support McGraw's New Venture.**

85.    On information and belief, during the same time they were allegedly negotiating with TBN to restructure Merit Street, McGraw and Peteski were making plans to create a new company, Envoy, to replace Merit Street. Tellingly, Envoy was incorporated in Delaware by Manatt[14] just one day before Merit Street filed for bankruptcy.

86.    The day after Merit Street instituted the Chapter 11 Case, all but six of the remaining Merit Street employees were terminated. On information and belief, the remaining six employees are individuals within McGraw's inner circle. Additionally, TBN has reason to believe that former Merit Street employees and contractors are performing services for Envoy. By way of example, Phil Gililigan, identified by Merit Street as its acting Chief Financial Officer, lists himself as "Sr. Financial Advisor, Envoy Media Co, Inc." on LinkedIn.[15] Moreover, one of the remaining Merit Street employees attempted to access Merit Street media for Envoy.

87.    Indeed, prior to filing its Chapter 11 petition, Merit Street principals discussed hiring Merit Street employees at the new venture in due course.

88.    On information and belief, Envoy is also soliciting Merit Street's advertisers, content creators, and distributors. For example, Steve Harvey, through his company Wonder Love, Inc., has an Overall, First Look & Services Agreement with Merit Street, which Merit Street seeks to reject. *See Debtor's Motion for Entry of an Order (I) Authorizing Rejection of Certain Executory Contracts and (II) Granting Related Relief* [Dkt. 181]. It was recently announced that Mr. Harvey

---

[14]    *See*    https://www.manatt.com/insights/news/2025/manatt-represents-dr-phil-in-new-media-venture.

[15] *See* https://www.linkedin.com/in/phil-gilligan-401544b.

**TRINITY BROADCASTING OF TEXAS, INC.'S ORIGINAL THIRD-PARTY
COMPLAINT AGAINST PETESKI PRODUCTIONS, INC. AND PHILLIP C. MCGRAW**          **PAGE 25**

will be creating original content for Envoy. *See* https://thedesk.net/2025/07/dr-phil-envoy-media-launch/.

89.    TBN also has reason to believe that McGraw intends to use the media library he promised to contribute (but did not contribute until February 2025) to Merit Street at Envoy while leaving TBN, Merit Street's creditors, and other interested parties with nothing but litigation over McGraw's wrongful conduct. Notably, the Merit Street statement of financial affairs does not list this license agreement and Merit Street has not sought to reject or assume this license agreement. Perhaps unaware of the Manatt press release, McGraw is acting as though that license does not exist so that Peteski can license the media library to Envoy.

## V.    CAUSES OF ACTION

### A.    Count 1: Fraudulent Inducement (BLI)

90.    TBN restates and realleges the preceding paragraphs as if fully set forth herein.

91.    To induce TBN to execute the BLI, McGraw and Peteski, through McGraw, made numerous material representations to TBN. Specifically, McGraw, on behalf of himself and Peteski, represented to TBN that:

a.    CBS was selling out the advertising inventories for the *Dr. Phil Show* and the *Dr. Phil Show* received significant advertising revenue per show;

b.    the new programming McGraw would create for TBN would be 90-minute shows, rather than the then-current 60-minute shows, in order to increase overall advertising revenue created by additional available advertising spots on the 90-minute show format;

c.    advertising and other revenue together with cost cutting savings would easily cover the fees associated with any agreement McGraw and/or Peteski reached with TBN and would generate substantial profits for all parties even in the first year;

d.    the then-current approximately $68 million per year production costs for the *Dr. Phil Show* could—and would—immediately be reduced by at least 40 percent by (i) moving all related production activities from California to Texas; (ii) not bringing any current personnel associated with the *Dr. Phil*

*Show* to Texas; (iii) eliminating unionized employees and benefits and reducing overall head count; and (iv) other cost saving measures;

e.  McGraw's viewership and advertisers were highly loyal to him and would follow him wherever he went; and

f.  McGraw owned the media library containing all his previously recorded programs, and the network he and/or Peteski would create with TBN would have access to this 21-year media library at no additional cost.

92.  These representations by McGraw and Peteski were both material and false.

93.  On information and belief, at the time McGraw made these statements, on behalf of himself and Peteski, he either knew the statements were false or he made them with reckless indifference to the truth.

94.  These statements induced TBN to enter into the BLI.

95.  TBN reasonably relied on McGraw and Peteski's representations regarding the size of McGraw's viewership, ownership and control over his media library, revenue projections, product integrations, advertising experience, and relationships with advertisers.

96.  As a result of McGraw and Peteski's representations, TBN has been and continues to be damaged by McGraw and Peteski's fraudulent acts as alleged herein and seeks all damages proximately caused thereby, including but not limited to exemplary damages. Alternatively, TBN seeks rescission and a restoration of the parties to a position as if the BLI had never been agreed upon plus court costs.

**B.    Count 2: Breach of Contract (BLI)**

97.  TBN restates and realleges the preceding paragraphs as if fully set forth herein.

98.  This count is pleaded in the alternative to Count 1.

99.  TBN and Peteski entered into the BLI, a valid contract dated January 10, 2023.

100.     TBN performed all of its duties and obligations under the BLI or was excused from performance due to Peteski's prior material breach.

101.     Under Section 5 of the BLI, Peteski was obligated to provide the following "**Services**":

    a.    Create "new content" consisting of "160 (90 minute) new, topical episodes of the show 'Dr. Phil' (the 'Show') delivered over 24-27 production weeks, as needed. Including stage and field shoots." Ex. A at § 5. The "new content" was to be in a format "consistent with the [then-]current format of Dr. Phil episodes" and of "first class quality and comparable to the quality of other first run syndicated television programming." *Id.*

    b.    "[U]se reasonable efforts to provide, mutually agreed upon, integrations and product placements for the show (full integrations being 3-5 minutes, with story built around the product." *Id.*

    c.    "[U]se reasonable efforts to provide, mutually agreed upon, sponsorships that will be 'voiced' and acknowledged on air, by McGraw with digital components accompanying as negotiated." *Id.*

    d.    Create "[t]wo primetime specials, or documents and act as Executive Producer, on TBN programming platforms, in order to cross promote for both channels, for no hosting fee to either channel and to make reasonable guest appearances to support programming." *Id.*

102.     Despite its contractual obligations, Peteski never provided any of these Services.

103.     TBN has been damaged by Peteski's failure to provide these Services. TBN seeks recovery of its actual damages, court costs, reasonable attorneys' fees, and pre- and post-judgment interest.

## C.     Count 3: Declaratory Judgment (BLI)

104.     TBN restates and realleges the preceding paragraphs as if fully set forth herein.

105.     This count is pleaded in the alternative to Counts 1 and 2.

106.     A dispute exists between TBN, on the one hand, and Peteski and McGraw, on the other, and a justiciable controversy exists regarding their interests and rights under the BLI.

107.     Pursuant to 28 U.S.C. §§ 2201, et seq., TBN petitions this Court for a declaration of the parties' rights, duties, and legal relations under the BLI.

108.     Specifically, TBN seeks judicial determinations that: (a) McGraw agreed to contribute his media library of old episodes of the *Dr. Phil Show* to Merit Street as part of Peteski's consideration for receiving a 30% ownership interest in Merit Street; (b) McGraw subsequently refused to contribute his media library or allow TBN to air old episodes of the *Dr. Phil Show* on Merit Street; and (c) the BLI is invalid and unenforceable due to a lack of consideration.

109.     By granting the declaratory relief sought by TBN, the Court will resolve the uncertainty surrounding an ongoing and continuing dispute as to the parties' rights, obligations, and liabilities under the BLI.

**D.     Count 4: Fraudulent Inducement (Stock Amendment)**

110.     TBN restates and realleges the preceding paragraphs as if fully set forth herein.

111.     To induce TBN to execute the Stock Amendment, McGraw and Peteski made numerous material representations to TBN. Specifically, McGraw, on behalf of himself and Peteski, represented to TBN that the Stock Amendment represented the first step in a multi-step process to restructure the parties' relationship and obligations.

112.     McGraw and Peteski also represented to TBN that they would work expeditiously to finalize formal agreements on the remaining restructuring points after TBN executed the Stock Amendment.

113.     These representations by McGraw and Peteski were both material and false.

114.     On information and belief, at the time McGraw and Peteski made these statements, they either knew the statements were false or they made them with reckless indifference to the truth.

115.    These statements induced TBN to enter into the Stock Amendment.

116.    TBN reasonably relied on McGraw and Peteski's representations regarding their promise to continue the restructuring plans and enter into formal agreements after further negotiations.

117.    As a result of McGraw and Peteski's representations, TBN has been and continues to be damaged by McGraw and Peteski's fraudulent acts as alleged herein and seeks all damages proximately caused thereby, including but not limited to exemplary damages. Alternatively, TBN seeks rescission and a restoration of the parties to a position as if the Stock Amendment had never been agreed upon plus court costs.

### E.    Count 5: Declaratory Judgment (Stock Amendment)

118.    TBN restates and realleges the preceding paragraphs as if fully set forth herein.

119.    This count is pleaded in the alternative to Count 4.

120.    A dispute exists between TBN and Peteski and McGraw, and a justiciable controversy exists regarding their interests and rights under the Stock Amendment.

121.    Pursuant to 28 U.S.C. §§ 2201, et seq., TBN petitions this Court for a declaration of the parties' rights, duties, and legal relations under the Stock Amendment.

122.    Specifically, TBN seeks judicial determinations that: (a) McGraw and Peteski agreed to a multi-step process for restructuring their relationship with TBN and the parties' respective obligations; (b) McGraw and Peteski represented to TBN that the first step in the restructuring process was the execution of the Stock Amendment; (c) McGraw and Peteski represented to TBN that after the Stock Amendment was executed, they would work expeditiously to reach formal agreements on the remaining restructuring steps; (d) McGraw and Peteski failed and refused to complete the restructuring process as promised; (e) TBN did not receive any

consideration for the 40% of outstanding stock in Merit Street that it transferred to Peteski; and (f) the Stock Amendment is invalid and unenforceable due to a failure of conditions subsequent and/or lack of consideration.

123.    By granting the declaratory relief sought by TBN, the Court will resolve the uncertainty surrounding an ongoing and continuing dispute as to the parties' rights, obligations, and liabilities under the Stock Amendment.

**F.    Count 6: Breach of Contract (Voting Agreement)**

124.    TBN restates and realleges the preceding paragraphs as if fully set forth herein.

125.    TBN and Peteski entered into the Voting Agreement, a valid contract dated March 5, 2024.

126.    TBN performed all of its duties and obligations under the Voting Agreement or was excused from performance.

127.    Under Section 1.2 of the Voting Agreement, TBN was entitled to designate two individuals to the board of directors of Merit Street. Ex. B at § 1.2. TBN designated Matthew Crouch and Samuel Smadja as its designated members.

128.    Section 1.4 of the Voting Agreement provides that TBN's designated members cannot be removed from the board of directors unless they are removed for cause or TBN directs or approves of their removal. *Id.* at § 1.4.

129.    Despite these contractual provisions, Peteski breached Section 1.4 of the Voting Agreement by purportedly removing Matthew Crouch and Samuel Smadja from Merit Street's board of directors.

130.    TBN has been damaged by Peteski's purported removal of TBN's designated board members. TBN seeks recovery of its actual damages, court costs, reasonable attorneys' fees, and

pre- and post-judgment interest. TBN also seeks a permanent injunction ordering that Matthew Crouch and Samuel Smadja be restored to their positions on Merit Street's board of directors.

**G.    Count 7: Declaratory Judgment (Voting Agreement)**

131.    TBN restates and realleges the preceding paragraphs as if fully set forth herein.

132.    This count is pleaded in the alternative to Count 6.

133.    A dispute exists between TBN and Peteski and McGraw, and a justiciable controversy exists regarding their interests and rights under the Voting Agreement.

134.    Pursuant to 28 U.S.C. §§ 2201, et seq., TBN petitions this Court for a declaration of the parties' rights, duties, and legal relations under the Voting Agreement.

135.    Specifically, TBN seeks judicial determinations that: (a) Matthew Crouch and Samuel Smadja were properly appointed to Merit Street's board of directors pursuant to Section 1.2 of the Voting Agreement; (b) McGraw and/or Peteski lacked the authority to remove Matthew Crouch and Samuel Smadja from Merit Street's board of directors under Section 1.4 of the Voting Agreement; (c) McGraw and/or Peteski's purported removal of Matthew Crouch and Samuel Smadja from Merit Street's board of directors was ineffective; (d) because they were not removed from the board, Matthew Crouch and Samuel Smadja are current members of Merit Street's board of directors; (e) any actions McGraw took as "sole director" are null and void.

136.    By granting the declaratory relief sought by TBN, the Court will resolve the uncertainty surrounding an ongoing and continuing dispute as to the parties' rights, obligations, and liabilities under the Voting Agreement.

## VI.    CONDITIONS PRECEDENT

137.    TBN restates and realleges the preceding paragraphs as if fully set forth herein.

138.    All conditions precedent to TBN's recovery in this action have occurred, been performed, satisfied, waived, or otherwise fulfilled.

## VII.    ATTORNEYS' FEES

139.    Because of the above-described conduct by Peteski and McGraw, TBN was required to retain attorneys to prosecute this action and agreed to pay the retained attorneys a reasonable fee. Accordingly, TBN seeks recovery of its reasonable and necessary attorneys' fees.

## VIII.    REQUEST FOR RELIEF

For the reasons set forth herein, TBN asks that McGraw and Peteski be cited to appear and answer this suit. TBN also asks that this Court enter an order and judgment against McGraw and Peteski as follows:

a.  an award of TBN's actual damages, including special and consequential damages in an amount to be proven at trial;

b.  an award of exemplary damages in an amount to be proven at trial;

c.  rescission of the BLI;

d.  rescission of the Stock Amendment;

e.  declarations that (i) McGraw agreed to contribute his media library of old episodes of the *Dr. Phil Show* to Merit Street as part of Peteski's consideration for receiving a 30% ownership interest in Merit Street; (ii) McGraw subsequently refused to contribute his media library or allow TBN to air old episodes of the *Dr. Phil Show* on Merit Street; and (iii) the BLI is invalid and unenforceable due to a lack of consideration;

f.  declarations that (i) McGraw and Peteski agreed to a multi-step process for restructuring their relationship with TBN and the parties' respective obligations; (ii) McGraw and Peteski represented to TBN that the first step in the restructuring process was the execution of the Stock Amendment; (iii) McGraw and Peteski represented to TBN that after the Stock Amendment was executed, they would work expeditiously to reach formal agreements on the remaining restructuring steps; (iv) McGraw and Peteski failed and refused to continue the restructuring process as promised after TBN signed the Stock Amendment; (v) TBN did not receive any consideration for the 40% of outstanding stock in Merit Street that it transferred to Peteski; and (vi) the Stock Amendment is invalid and unenforceable due to a failure of conditions subsequent and/or lack of consideration;

g.  declarations that (i) Matthew Crouch and Samuel Smadja were properly appointed to Merit Street's board of directors pursuant to Section 1.2 of the Voting Agreement; (ii) McGraw and/or Peteski lacked the authority to remove Matthew Crouch and Samuel Smadja from Merit Street's board of directors under Section 1.4 of the Voting Agreement; (iii) McGraw and/or Peteski's purported removal of Matthew Crouch and Samuel Smadja from Merit Street's board of directors was ineffective; (iv) because they were not removed from the board, Matthew Crouch and Samuel Smadja are current members of Merit Street's board of directors; and (v) any actions McGraw took as "sole director" are null and void.

h.  a permanent injunction ordering that Matthew Crouch and Samuel Smadja be restored to their positions on Merit Street's board of directors

i.  an award of TBN's reasonable and necessary attorneys' fees, pre- and post-judgment interest, and costs of court in this action; and/or

j.  an award of such other relief to TBN as this Court deems just and proper.

*[The remainder of this page is intentionally left blank]*

DATED: August 19, 2025

Respectfully submitted by:

*/s/ Steven C. Lockhart*
Holland N. O'Neil (TX 14864700)
Robert Slovak (TX 24013523)
Steven C. Lockhart (TX 24036981)
Mark C. Moore (TX 24074751)
Stephanie L. McPhail (TX 24104104)
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
honeil@foley.com
rslovak@foley.com
slockhart@foley.com
mmoore@foley.com
smcphail@foley.com

-and-

Rajiv Dharnidharka
(admitted *pro hac vice*)
**FOLEY & LARDNER LLP**
555 California Steet, Suite 1700
San Francisco, CA 94104
Telephone: (415) 434-4484
Facsimile: (415) 434-4507
rajiv.dharnidharka@foley.com

-and-

Nora J. McGuffey (TX 24121000)
**FOLEY & LARDNER LLP**
321 North Clark Street, Suite 3000
Chicago, IL 60654
Telephone: (312) 832-4366
Facsimile: (312) 832-4700
nora.mcguffey@foley.com

**Attorneys for Trinity Broadcasting of Texas, Inc.
dba Trinity Broadcasting Network and TCT
Ministries, Inc.**

## CERTIFICATE OF SERVICE

I certify that I caused the foregoing document to be filed on August 19, 2025, using the Court's CM/ECF System which caused it to be served upon those parties registered in the system to receive such service.

*/s/ Stephanie L. McPhail*
Stephanie L. McPhail
