## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| MERIT STREET MEDIA, INC.[1] | § § § | Case No. 25-80156 (SWE) |
| Debtor. | § § | |
| MERIT STREET MEDIA, INC. | § § | |
| Plaintiff, | § § | |
| v. | § § | Adversary No. 25-08006-SWE |
| TRINITY BROADCASTING OF TEXAS, INC. and TCT MINISTRIES, INC. | § § § § | |
| Defendants. | § § | |
| TRINITY BROADCASTING OF TEXAS, INC. | § § § | |
| Third-Party Plaintiff, | § § | |
| v. | § § | |
| PETESKI PRODUCTIONS, INC. and PHILLIP C. MCGRAW | § § § § | |
| Third-Party Defendants. | § § | |

### TRINITY BROADCASTING OF TEXAS, INC.'S RESPONSE IN OPPOSITION TO THIRD-PARTY DEFENDANTS PETESKI PRODUCTIONS, INC. AND PHILLIP C. MCGRAW'S MOTION TO COMPEL ARBITRATION AND STAY, OR IN THE ALTERNATIVE, MOTION TO ABSTAIN, OR IN THE ALTERNATIVE, MOTION TO DISMISS

---

[1] The last four digits of the Debtor's federal tax identification number are 8990. The Debtor's mailing address is 5501 Alliance Gateway Fwy, Fort Worth, Texas 76177.

# TABLE OF CONTENTS

I.    Introduction ................................................................................................................5

II.    BACKGROUND ........................................................................................................6

    A.    TBN and Defendants Create MSM. ...................................................................6

    B.    The Stock Amendment ......................................................................................8

    C.    McGraw and Peteski Make Their "Gangster Move" to Assume Control
        over MSM .........................................................................................................10

    D.    McGraw and Peteski Force MSM into Bankruptcy. ........................................10

    E.    TBN Files Its Third-Party Complaint. .............................................................11

III.    ARGUMENT ...........................................................................................................12

    A.    Defendants Waived Their Right to Arbitrate TBN's Claims Based on the BLI
        (Counts 1–3)....................................................................................................12

        i.    This Court—not an arbitrator—decides the issue of waiver of the right
            to arbitrate..........................................................................................13

        ii.    Defendants' litigation conduct—and the litigation conduct orchestrated
            through MSM—waived Defendants' right to arbitrate TBN's claims...............14

    B.    TBN's Claims Arising from the Voting Agreement and Stock Confirmation
        (Counts 4–7) Are Not Arbitrable.....................................................................18

        i.    This Court—not an arbitrator—decides the issue of arbitrability. ....................18

        ii.    Counts 4 through 7 of TBN's Complaint relate to the Voting Agreement and
            Stock Amendment—not the BLI. ......................................................................19

    C.    This Court Should Not Abstain from Hearing TBN's Claims. ..............................21

    D.    This Court Has Subject Matter Jurisdiction over TBN's Claims..............................25

IV.    CONCLUSION ........................................................................................................26

# TABLE OF AUTHORITIES

**Cases**                                                                                                    Page(s)

*Al Rushaid v. Nat'l Oilwell Varco, Inc.*,
   757 F.3d 416 (5th Cir. 2014) .............................................................................................15

*American Bankers Ins. Co. of Fla. v. Inman*,
   436 F.3d 490 (5th Cir. 2006) .............................................................................................12

*Andres Holding Corp. v. Villaje Del Rio, Ltd.*,
   No. CIVA SA-09-CA-127-XR, 2009 WL 2252251 (W.D. Tex. July 24, 2009) .......................17

*Feld v. Zale Corp.* (*In re Zale*),
   62 F.3d 746 (5th Cir. 1995) ...............................................................................................25

*Fire Eagle L.L.C. v. Bischoff* (*In re Spillman*),
   710 F.3d 299 (5th Cir. 2013) .............................................................................................25

*First Options of Chicago, Inc. v. Kaplan*,
   514 U.S. 938 (1995) ..............................................................................................13, 14, 19

*Forby v. One Techs., L.P.*,
   909 F.3d 780 (5th Cir. 2018) .............................................................................................13

*Garcia v. Fuentes Rest. Mgmt. Services Inc.*,
   141 F.4th 671 (5th Cir. 2025) ............................................................................................13

*Gardemal v. Westin Hotel Co.*,
   186 F.3d 588 (5th Cir.1999) ..............................................................................................17

*Grace Cmty. Church v. Gonzales*,
   853 S.W.2d 678 (Tex. App.—Houston [14th Dist.] 1993, no writ)...........................................15

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
   586 U.S. 63 (2019) ...........................................................................................................18

*In re Canion*,
   196 F.3d 579 (5th Cir. 1999) .............................................................................................25

*In re KSRP, Ltd.*,
   809 F.3d 263 (5th Cir. 2015) .............................................................................................25

*In re Rodriguez*,
   No. 10-70606, 2021 WL 4562254 (Bankr. S.D. Tex. Oct. 5, 2021)...........................................24

*In re Schouten*,
   657 B.R. 531 (Bankr. N.D. Tex. 2024).................................................................................23

*In re TXNB Internal Case*,
   483 F.3d 292 (5th Cir. 2007) ............................................................................25

*Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Group, Ltd*.,
   999 F.3d 257 (5th Cir. 2021) ....................................................................14, 15, 18

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*,
   594 F.3d 383 (5th Cir. 2010) ............................................................................25

*Lone Star Fund V (U.S.), LP v. Barclays Bank PLC*,
   Civil Action No. 3:08-CV-0261-L, 2008 WL 4449508 (N.D. Tex. Sept. 30, 2008) ................23

*Matter of Sims*,
   994 F.2d 210 (5th Cir. 1993) ............................................................................17

*Miller v. Kemira, Inc*. (*In re Lemco Gypsum, Inc*.),
   910 F.2d 784 (11th Cir. 1990)............................................................................25

*Neal v. Hardee's Food Sys., Inc*.,
   918 F.2d 34 (5th Cir. 1990) ............................................................................19

*Nicholas v. KBR, Inc*.,
   565 F.3d 904 (5th Cir. 2009) ....................................................................13, 14

*Pers. Sec. & Safety Sys. Inc. v. Motorola Inc*.,
   297 F.3d 388 (5th Cir. 2002) ....................................................................19, 21

*Principal Life Ins. Co. v. JPMorgan Chase Bank, N.A.* (*In re Brook Mays Music Co*.),
   363 B.R. 801 (Bankr. N.D. Tex. 2007)............................................................23

*Royal Mortgage Corp. v. Montague*,
   41 S.W.3d 721 (Tex. App.—Fort Worth 2001, pet. denied) ....................................15

*Schott Glas v. Adame*,
   178 S.W.3d 307 (Tex. App.—Houston [14th Dist.] 2005, pet. denied)............................15, 16

*Tellez v. Madrigal*,
   292 F. Supp. 3d 749 (W.D. Tex. 2017) ....................................................................14

*Vine v. PLS Fin. Services, Inc*.,
   689 Fed. Appx. 800 (5th Cir. 2017)............................................................................14

**Statutes**

28 U.S.C. § 1334 ....................................................................................21, 22, 26

**TRINITY BROADCASTING OF TEXAS, INC.'S RESPONSE TO MOTION TO COMPEL ARBITRATION
PAGE 4**

Third-Party Plaintiff Trinity Broadcasting of Texas, Inc. dba Trinity Broadcasting Network ("**TBN**" or "**Plaintiff**") respectfully submits this response in opposition to the Motion to Compel Arbitration and Stay, or in the Alternative, Motion to Abstain or Dismiss (the "**Motion**") [Adv. Dkt. 69] filed by Third-Party Defendants Peteski Productions, Inc. ("**Peteski**") and Phillip C. McGraw ("**McGraw**") (collectively, "**Defendants**").[2] In support of this response, TBN respectfully shows the Court as follows:

## I.     INTRODUCTION

1.      In conjunction with TBN's motion to dismiss Merit Street Media, Inc.'s ("**MSM**" or "**Debtor**") Chapter 11 case, this Court heard several days of testimony that led to an inescapable conclusion: McGraw used Peteski and MSM as instrumentalities in his bankruptcy and litigation scheme to rid himself of TBN and set up his new media network, Envoy Media Co. ("**Envoy**"). After causing (1) MSM to file its bankruptcy petition and adversary action against TBN and (2) Peteski to delve into the merits of its dispute with TBN during the motion to dismiss hearing, Defendants now claim that TBN's Third-Party Complaint (the "**Complaint**") against Peteski and McGraw, in his individual capacity [Adv. Dkt. 55] should be compelled to arbitration. It is far too late for that. Defendants waived whatever right to arbitrate the claims asserted in the Complaint through their own litigation conduct—and the conduct of MSM they orchestrated.

2.      But even setting aside this threshold determinative issue, Defendants' arguments in favor of arbitration fall flat. For example, Defendants seek to compel arbitration of TBN's claims based on contracts that do not contain an arbitration provision. Their argument that an arbitration provision in the January 10, 2023, Binding Letter of Intent ("**BLI**") covers disputes arising from

---

[2] In light of the Court's upcoming oral ruling on TBN's motion to dismiss Debtor's Chapter 11 case—which may contain findings of fact and conclusions of law that impact Defendants' ability to compel arbitration, TBN reserves the right to supplement this response.

separate contracts executed over a year later strains the language of the BLI's arbitration provision well past its breaking point.

3.       Lastly, this Court should decline Defendants' request that the Court abstain from hearing TBN's Complaint or dismiss it outright. This Court is now well-acquainted with how inextricably intertwined TBN's claims against Defendants are with the orderly administration of the underlying Chapter 11 case. The Court has a broad jurisdictional grant to hear these claims and should use it to ensure that all disputes related to the bankruptcy case be heard here, where this Court's familiarity with the parties and facts will lead to a far more efficient resolution.

## II.       BACKGROUND

4.       In the interest of brevity—and given the Court's already-intimate understanding of the facts underlying the parties' disputes—TBN will provide a brief summary of the facts relevant to Defendants' Motion below. TBN incorporates by reference the factual background provided in its motion to dismiss [Bnkr. Dkt. 100], reply in support of the same [Bnkr. Dkt. 401], and the Complaint [Adv. Dkt. 51].

## A.       TBN and Defendants Create MSM.

5.       In late 2022, McGraw approached TBN as a replacement network for CBS, who had hosted McGraw's content for the past twenty years.

6.       On January 10, 2023, based on McGraw's representations that CBS wanted to renew his contract and that moving his programming to a new network would result in a profitable new enterprise, TBN and Peteski executed the BLI. [Adv. Dkt. 48-1]. The BLI provided for the formation of a newly branded television network (tentatively named "NewCo" and later renamed to MSM), which was owned 70% by TBN and 30% by Peteski. [Adv. Dkt. 48-1 at 2]. The BLI described the parties' respective obligations, including production and distribution services, the

creation of 160 90-minute shows delivered over a five- to six-month production cycle, and

payments. [Adv. Dkt. 48-1 at 2–6].

7.      In the event of a dispute, the BLI contained an arbitration provision stating as

follows:

> This Agreement will be governed by and construed in accordance with the laws of
> the state of Delaware. All disputes relating, directly or indirectly, to this Term Sheet
> in any way, will be submitted exclusively to, and decided exclusively in, a
> confidential arbitration under the rules of JAMS in the County of Los Angeles,
> California. The arbitrability of this provision will be solely determined by JAMS.
> In the event that any party seeks relief under this Agreement in any venue other
> than through JAMS (including, but not limited to federal or state court), then the
> complaining party will pay all of the costs, fees (including attorneys' fees), and
> expenses of the responding party. Each party will pay its own proportionate share
> of arbitrator fees and expenses. The parties each waive the right to seek any
> consequential, indirect, incidental and punitive damages and the arbitrator will have
> no authority to award such damages. The sole monetary remedy of each party in
> the event of any breach hereunder will be a demand for arbitration seeking the
> recovery of monetary damages actually suffered. The parties waive any right of
> appeal. The parties further waive any right to a jury trial. In the event that either
> files any claim against any shareholder, employee, officer, director, member,
> manager, representative, principal or agent of the other party, then the parties
> hereby agree that any such claims will also be subject to this dispute resolution
> section.

[Adv. Dkt. 48-1 at § 10].

8.      Fourteen months after the BLI was executed, TBN and Defendants negotiated

various governing documents for MSM. Among them was a document establishing the procedures

for the constitution of the MSM board of directors (the "**Voting Agreement**"), executed on March

5, 2024. [Bnkr. Dkt. 499 at Ex. 7]. The Voting Agreement provides for a three-person Board of

Directors, with two members to be designated by TBN and one by Peteski. [*Id.* at § 1.2]. The

Voting Agreement further provides that no director may be removed from office other than for

cause unless the appointing shareholder (i.e., TBN or Peteski) directs or approves such removal.

[*Id.* at § 1.4]. The three directors appointed on March 5, 2024, were: Matthew Crouch (a TBN designee), McGraw (a Peteski designee), and Samuel Smadja (a TBN designee). [*Id.* at § 1.2].

9.      The Voting Agreement <u>does not</u> contain an arbitration provision. In fact, the Voting Agreement specifically requires that the parties submit any dispute to "the state courts of Texas [or] to the jurisdiction of the United States District Court for the Northern District of Texas." [*Id.* at § 6.16].

10.     That same day, on March 5, 2024, the parties executed two Stock Purchase Agreements, one between MSM and TBN and one between MSM and Peteski. [Bnkr. Dkt. 499 at Exs. 4, 6]. Like the Voting Agreement, the Stock Purchase Agreements do not contain an arbitration provision. Rather, they contemplate that "a court" will hear any resulting disputes. [Bnkr. Dkt. 499 at Exs. 4 § 9(f), 6 § 9(f)].

11.     In April 2024, a month after the parties executed the Voting Agreement, MSM launched. But, almost immediately, it became clear that Defendants could not deliver the viewership numbers, product integrations, or advertising revenues they previously promised to TBN when inducing it to sign the BLI. TBN and Defendants met several times to discuss MSM's underperformance, Defendants' failure to live up to their contractual obligations, and the impact on TBN from its blank-check funding of MSM's operations.

12.     In July 2024, after it became clear that Defendants were unwilling or able to perform, TBN notified them that TBN would cease paying certain amounts due under the BLI and would stop loaning MSM funds for its operations after August 31, 2024.

## B.    The Stock Amendment

13.     Rather than address the underlying causes of MSM's floundering, McGraw responded to TBN's cessation of funding by stating that he had a solution to the problem: TBN

should hand over the reins of MSM to Peteski. On July 30, 2024, McGraw informed TBN that Peteski needed to acquire a majority-in-interest of the outstanding shares of MSM (swapping the parties' respective 70/30 ownership shares) to solicit outside investments for MSM's operations. According to McGraw, he had "friends and family" ready to invest tens of millions of dollars in MSM at a $425 million enterprise valuation as soon as he could show them that he had a controlling interest in the company. McGraw promised that if the stock positions were swapped that he would make TBN's proposed 30% ownership worth more than it was at the current 70% ownership interest.

14.     On August 1, 2024, TBN informed McGraw that it would be amenable to increasing Peteski's ownership share in MSM from 30% to 70% (thereby decreasing TBN's ownership share from 70% to 30%) subject to the parties addressing "a multitude of outstanding deal points to be finalized," including, among other things, recognition of the amounts TBN spent on MSM as secured loans, an amended lease for MSM's studio space at the Plex, and Defendants' agreement to fund all future MSM operational expenses. [Bnkr. Dkt. 499 at Ex. 36].

15.     Based on Defendants' repeated assurances to follow through with the remaining steps of the restructuring plan, TBN and Peteski executed the "Merit Street Stock Confirmation" (the "**Stock Amendment**") on August 8, 2024, which purported to "reduce" the number of shares purchased by TBN and "increase" the number of shares purchased by Peteski. [Bnkr. Dkt. 499 at Ex. 59].

16.     The Stock Amendment <u>does not</u> contain an arbitration provision but references the prior Stock Purchase Agreements, which contemplate resolution of disputes by "a court." [*See* Bnkr. Dkt. 499 at Exs. 4 § 9(f), 6 § 9(f)].

**C.**      **McGraw and Peteski Make Their "Gangster Move" to Assume Control over MSM.**

17.      Despite their promises to continue working diligently to address the other deal points necessary to effectuate the restructuring of MSM, Defendants failed to follow through. Instead, McGraw privately described the Stock Amendment as a "gangster move" that reduced TBN to nothing more than "a passive minority investor role" and seemed intent on taking the money and running instead of following through on his end of the bargain.

18.      Another step in McGraw's "gangster move"—after attempting to acquire a 70% ownership stake in MSM for no consideration—was to surreptitiously remove TBN's designated directors from MSM's board. In connection with another concocted emergency—the need to reincorporate MSM as a Texas entity for purposes of pending litigation—counsel from Jackson Walker (who apparently represented MSM, Peteski, and McGraw simultaneously) "notified" TBN that its directors had been removed from MSM's board. Despite the Voting Agreement prohibiting such removal, McGraw now purportedly assumed unrestrained authority to do as he wished with MSM and operated it as his personal fiefdom.

19.      Despite claiming victory in his unlawful corporate *coup d'état*, McGraw was unable to get MSM to stand on its own two feet. So, without TBN's knowledge, Defendants caused MSM to issue two convertible promissory notes to Peteski in the total amount of approximately $25.4 million on February 28, 2025, and June 1, 2025. Additionally, on June 30, 2025, and again without TBN's knowledge, Peteski issued a secured bridge loan to MSM in the amount of approximately $7 million.

**D.**      **McGraw and Peteski Force MSM into Bankruptcy.**

20.      Two days after Peteski issued the bridge loan, the scheme Defendants developed in the dark finally came to light. On July 2, 2025, MSM filed a Chapter 11 petition orchestrated

through Defendants' creation of a special committee, hand-selection of Gary Broadbent as sole member of the special committee, and Broadbent's appointment as Chief Restructuring Officer. The filing came as a surprise to TBN because it still understood that it controlled two of the three directors on MSM's board and had not authorized the retention of Gary Broadbent or approved the bankruptcy petition.

21.     Simultaneously with the filing of the bankruptcy petition, MSM filed an adversary complaint against TBN [Adv. Dkt. 1], alleging that TBN breached the BLI, the terms of a December 2024 non-binding term sheet, and its fiduciary duties. The adversary complaint, like the bankruptcy petition, was "authorized" through Defendants' behind-the-scenes machinations using MSM as helpful instrumentality to wage war against their former business partner, TBN.

22.     Just a few days after the filing of the bankruptcy petition and adversary complaint, much more of the scheme was revealed. At the same time Defendants were forcing MSM into bankruptcy, they were busy stripping the company down to its studs so as to prop up their new venture, Envoy.

23.     The day after MSM instituted the Chapter 11 case, all but six of MSM's employees were terminated. Many were rehired at Envoy. The six remaining employees performed services for Envoy while being paid by MSM, including MSM's highest-ranking officers (who happened to be long-time collaborators with McGraw).

**E.      TBN Files Its Third-Party Complaint.**

24.     In response to the allegations that MSM lodged in its adversary complaint, on August 19, 2025, TBN filed its Complaint against Defendants. [Adv. Dkt. 51]. The Complaint asserted seven causes of action, all stemming from TBN and Defendants' ongoing disputes regarding the operations and funding of MSM. Specifically, TBN alleged:

- Count 1: Fraudulent Inducement regarding the BLI against McGraw and Peteski

- Count 2: Breach of Contract regarding the BLI against Peteski

- Count 3: Declaratory Judgment regarding BLI against McGraw and Peteski

- Count 4: Fraudulent Inducement regarding the Stock Amendment against McGraw and Peteski

- Count 5: Declaratory Judgment regarding the Stock Amendment against McGraw and Peteski

- Count 6: Breach of Contract regarding the Voting Agreement against Peteski

- Count 7: Declaratory Judgment regarding the Voting Agreement against McGraw and Peteski

25.     Defendants filed their Motion a month later, on September 22, 2025, asking this Court to compel TBN's claims to arbitration or, in the alternative, abstain from hearing the claims or dismiss the Complaint for lack of subject matter jurisdiction.

### III.    ARGUMENT

26.     After starting this fight in this Court, McGraw and Peteski have changed their tune and desperately want a different finder of fact. But this Court's understanding of McGraw and Peteski's role in forcing MSM into bankruptcy and orchestrating this adversary proceeding not only means that this Court is best suited to hear TBN's claims, but also that this Court is well aware that Defendants waived their right to arbitrate TBN's claims.

**A.    Defendants Waived Their Right to Arbitrate TBN's Claims Based on the BLI (Counts 1–3).**

27.     The Federal Arbitration Act does no more than "place arbitration clauses on the same footing as other contracts and allows an aggrieved party to move to compel arbitration when the opposing party fails to comply with an arbitration agreement." *American Bankers Ins. Co. of*

*Fla. v. Inman*, 436 F.3d 490, 492–93 (5th Cir. 2006) (cleaned up). And "the right to arbitrate—like all contract rights—is subject to waiver" if the party "act[s] inconsistently with that right." *Forby v. One Techs., L.P.*, 909 F.3d 780, 783 (5th Cir. 2018) (citing *Nicholas v. KBR, Inc.*, 565 F.3d 904, 907 (5th Cir. 2009)); *Garcia v. Fuentes Rest. Mgmt. Services Inc.*, 141 F.4th 671, 676 (5th Cir. 2025).

28.     That is precisely what occurred here, where Defendants, placed the same BLI-based claims in TBN's Complaint at issue in this Court through (1) MSM's adversary complaint and (2) repeatedly litigating the merits of those claims during the motion to dismiss proceedings.

    i.   <u>This Court—not an arbitrator—decides the issue of waiver of the right to arbitrate.</u>

29.     As a threshold matter, Defendants urge this Court to accept at face-value that TBN's claims are arbitrable and simply hand over those claims to an arbitrator without further analysis or ado. [Adv. Dkt. 70 at 16 (arguing that, "[i]n the event this Court has any question as to whether the claims in the Third-Party Complaint fall within the scope of the arbitration provision, the Court must send that determination to arbitration")]. Yet this Court has an important job to do that Defendants gloss over.

30.     "[A] party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 945 (1995). So, absent "clear and unmistakable evidence" of an agreement to the contrary, the presumption is that a court will decide a given issue. *Id.* at 944. Accordingly, courts should not "interpret silence or ambiguity... as giving the arbitrator that power, for doing so might too often force unwilling parties to arbitrate a matter they would have reasonably thought a judge... would decide." *Id.*

31.     So, while it may be the case that the parties agreed to delegate questions of ***arbitrability of claims based on the BLI*** to the arbitrator, they did not delegate questions of

whether Defendants waived their right to arbitrate. As a result, the question of whether Defendants'

litigation conduct constitutes a waiver is for this Court—not an arbitrator—to decide. *See Vine v.*

*PLS Fin. Services, Inc.*, 689 Fed. Appx. 800, 803 (5th Cir. 2017) (finding that the court must decide

issues of litigation-conduct waiver); *Tellez v. Madrigal*, 292 F. Supp. 3d 749, 756 (W.D. Tex. 2017)

(same); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944–45 (1995) (explaining that,

unless parties specifically delegate an issue to an arbitrator, the presumption that the court decide

an issue controls).

> ii. Defendants' litigation conduct—and the litigation conduct orchestrated through
> MSM—waived Defendants' right to arbitrate TBN's claims.

32.     The usual test for whether a party acts inconsistent with its right to arbitrate claims

is whether the party "substantially invokes the judicial process," rather than the arbitral process.

*See Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Group, Ltd*., 999 F.3d 257, 266 (5th Cir.

2021). And, like in *Int'l Energy Ventures*, "the substantial-invocation analysis in this case is

straightforward." *Id.* "Substantial invocation occurs when a party performs an 'overt act in [c]ourt

that evinces a desire to resolve the arbitrable dispute through litigation rather than arbitration." *Id.*

(citing *Nicholas v. KBR, Inc*., 565 F.3d 904, 907 (5th Cir. 2009) (cleaned up)). "It is difficult to see

how a party could more clearly evince such a desire than by filing a lawsuit going to the merits of

an otherwise arbitrable dispute." *Id.* (citing *Nicholas,* 565 F.3d at 908 (cleaned up)).

33.     Defendants argue that this Court must compel to arbitration Counts 1, 2, and 3 of

TBN's Complaint. Those claims allege that (1) Defendants fraudulently induced TBN into entering

in the BLI, (2) breached their obligations to perform pursuant to the BLI, and (3) a dispute exists

regarding the parties' rights and obligations under the BLI.

34.     Yet, one and a half months prior to the filing of TBN's Complaint, MSM filed its

adversary complaint that seeks judicial determinations of those very same issues. Specifically,

Counts I and II of MSM's complaint asserts that TBN—not Defendants—breached express provisions of the BLI or, at a minimum, breached the covenant of good faith inherent in that contract. [*See* Adv. Dkt. 1 at 19–22]. TBN's and MSM's respective claims are but mirrors of each other. Yet, it was MSM that first performed that "overt act" that made clear it wished to resolve the supposedly "arbitrable dispute through litigation rather than arbitration." *See Int'l Energy Ventures*, 999 F.3d at 266.

35.    Defendants are likely to argue that MSM—not McGraw or Peteski—was responsible for the filing of the adversary complaint and that act cannot be imputed to them for purposes of the waiver analysis. They are legally and factual mistaken.

36.    <u>Legally</u>, the façade of corporate separateness McGraw and Peteski hide behind is not impenetrable. The Fifth Circuit has opined "an arbitration proponent's affiliates may be imputed to the proponent for the purposes of determining waiver when principles of agency or corporate law, such as the alter ego doctrine, would counsel such imputation." *Al Rushaid v. Nat'l Oilwell Varco, Inc.*, 757 F.3d 416, 422–23 (5th Cir. 2014).

37.    Texas law defines an "agent" as "one who is authorized by another to transact business or manage some affair." *Grace Cmty. Church v. Gonzale*s, 853 S.W.2d 678, 680 (Tex. App.—Houston [14th Dist.] 1993, no writ). In assessing the existence of an agency relationship, Texas courts generally apply the "right to control" test. *See Royal Mortgage Corp. v. Montague*, 41 S.W.3d 721, 733 (Tex. App.—Fort Worth 2001, pet. denied). Under this test, "[t]he defining feature of the agency relationship is the principal's right to control the actions of the agent." *Schott Glas v. Adame*, 178 S.W.3d 307, 315 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). An agency relationship exists when the principal can control "the end sought to be accomplished" as well as "the means and details of the accomplishment." *Id.* at 315.

38.    Concerning alter ego, the protections of corporate separateness can be ignored "when the corporate form has been used as part of a basically unfair device to achieve an inequitable result." *Id.* at 424. "This includes 'when the corporate structure has been abused to perpetuate a fraud, evade an existing obligation, achieve or perpetuate a monopoly, circumvent a statute, protect a crime, or justify wrong.'" *Id.*

39.    <u>Factually</u>, the motion to dismiss proceedings put on full display precisely how Defendants used MSM as both (1) their agent and (2) an instrumentality to engage in all manner of wrongdoing.

40.    Specifically, this Court is now well-apprised of how:

- Defendants purported to remove TBN's directors and hijack operational control of MSM. [Bnkr. Dkt. 499 at Ex. 151];

- After doing so, Defendants installed an all-too-acquiescent sole member of the Special Committee—Gary Broadbent. [Bnkr. Dkt. 499 at Ex. 302];

- Defendants' hand-selected Special Committee-of-one "decided" to file a Chapter 11 petition and adversary complaint within days of his appointment. [Bnkr. Dkt. 499 at Ex. 316];

- Despite the supposed "independence" of Gary Broadbent, McGraw boasted to several confidants (including Rosemarie Aquilina, Garry Pearson, and NYPD Chief Chell) that "I filed suit against TBN" and "I also then filed Ch. 11 for MSM." [Bnkr. Dkt. 499 at Exs. 373, 374; Bnkr. Dkt. 504 at PBR 282];

- McGraw assisted with drafting MSM's adversary complaint, which asserted claims against TBN that would have been more properly brought by Peteski. [Bnkr. Dkt. 499 at Ex. 320]; and

- Defendants denuded MSM of its resources for the benefit of Envoy, both before and after filing for bankruptcy protections (e.g., terminating employees so that they could be immediately rehired by Envoy and seeking to reject certain contracts [i.e., the Steve Harvey exclusive "first look" contract] that appear to have been at the behest of Envoy. [Bnkr. Dkt. 499 at Exs. 409, 419].

41.    Given what this Court has already heard, there is little doubt that Defendants "exercised complete control over [MSM] with respect to" its actions before this Court and that "control was used to commit a fraud or wrong that injured" TBN, namely the filing of a bad-faith bankruptcy case and an adversary suit against TBN. *Andres Holding Corp. v. Villaje Del Rio, Ltd.*, No. CIVA SA-09-CA-127-XR, 2009 WL 2252251, at *3 (W.D. Tex. July 24, 2009) (collecting cases including *Gardemal v. Westin Hotel Co.*, 186 F.3d 588 (5th Cir.1999); *Matter of Sims*, 994 F.2d 210 (5th Cir. 1993)). Under these circumstances, MSM actions are properly imputed to Defendants, and MSM's filing of the adversary complaint is an unequivocal waiver of Defendants' alleged right to arbitrate TBN's claims.

42.    But even if that waiver was not clear enough, McGraw and Peteski have no excuse for the litigation conduct undertaken in their own right. Defendants incessantly sought to litigate MSM's adversary action (and, by extension, defend against TBN's claims) during the course of the motion to dismiss proceedings. In fact, McGraw and Peteski's counsel persisted in raising issues related to the parties' respective performance/breach of their obligations under the BLI to such a degree (and with such frequency) that this Court was even forced to caution counsel about the potential waiver effect. [*See* Mot. to Dismiss Hrg. Tr. at 1379:18–1391:17 (the Court stating: "But the more you get into the background on the issues in the adversary, that you say you don't

want me to decide, I'm sitting up here as the guy calling balls and strikes wearing -- just a little confused about what's going on."].

43.      Between MSM's conduct that can be imputed to Defendants and Defendants' conduct during the motion to dismiss proceedings, there are plentiful examples of "overt acts" that made clear Defendants wished to resolve the supposedly "arbitrable dispute through litigation rather than arbitration." *See Int'l Energy Ventures*, 999 F.3d at 266.

**B.      TBN's Claims Arising from the Voting Agreement and Stock Amendment (Counts 4–7) Are Not Arbitrable.**

44.      Unlike the BLI, the Voting Agreement and Stock Amendment that form the basis of TBN's Counts 4 through 7 do not contain an arbitration provision. Whereas the Stock Amendment strongly implies that a court will hear any disputes, the Voting Agreement explicitly calls for any dispute to be resolved right here in the Northern District of Texas. Despite Defendants' strained attempt to pull those claims within the ambit of the BLI's arbitration provision, Counts 4 through 7 of the Complaint are not subject to arbitration.

i.      This Court—not an arbitrator—decides the issue of arbitrability.

45.      Defendants urge this Court to allow an arbitrator to decide whether Counts 4 through 7 of the Complaint are arbitrable. As explained above, parties are free to agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019). But they must do so by "clear and unmistakable evidence." *Id.* at 69.

46.      Unlike TBN's claims based on the BLI, Counts 4 through 7 are predicated on contracts that do not delegate questions of arbitrability; in fact, they do not even mention arbitration. There is no arbitration provision to speak of. So, Defendants cannot plausibly argue that there is "clear and unmistakable evidence" of an agreement to delegate questions of

arbitrability to an arbitrator for these claims. And, this Court should not "interpret silence or ambiguity... as giving the arbitrator that power, for doing so might too often force unwilling parties to arbitrate a matter they would have reasonably thought a judge... would decide." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). *Id.* at 944.

47.     Without any clear contractual mandate to the contrary, this Court must determine whether Counts 4 through 7 are arbitrable. They are not.

    ii.    <u>Counts 4 through 7 of TBN's Complaint relate to the Voting Agreement and Stock Amendment—not the BLI.</u>

48.     Faced with the glaring lack of an arbitration provision in the Voting Agreement and Stock Amendment, Defendants scramble to stretch the BLI's arbitration provision to cover these contracts as well. The essence of Defendants' argument is that the Voting Agreement and Stock Confirmation are "part of the same transaction" as the BLI such that the BLI's arbitration provision covers any disputes arising from the other contracts. In support of this contention, Defendants cite two Fifth Circuit cases supposedly standing for that proposition. *Pers. Sec. & Safety Sys. Inc. v. Motorola Inc.*, 297 F.3d 388, 392 (5th Cir. 2002); *Neal v. Hardee's Food Sys., Inc.*, 918 F.2d 34, 37–38 (5th Cir. 1990). But Defendants' reliance is misplaced.

49.     *Motorola* and *Hardee's* stand for the unremarkable proposition that "separate agreements ***executed contemporaneously*** by the same parties, for the same purposes, and as part of the same transaction, are to be construed together." *Motorola Inc.*, 297 F.3d at 393 (emphasis added). Accordingly, in each of those cases, an arbitration provision in one of the contracts was found to extend to the other contemporaneously executed agreements, which were completely silent on the question of arbitration. *Id.*; *Hardee's*, 918 F.2d at 37–38.

50.     But the undeniable logic of *Motorola* and *Hardee's* cannot be applied here.

51.    <u>First</u>, the Voting Agreement is not silent regarding the question of arbitration. It specifically provides that the Northern District of Texas shall be the venue for any dispute arising out of or based upon that contract:

> 6.16 Dispute Resolution. The parties (a) hereby irrevocably and unconditionally submit to the jurisdiction of the state courts of Texas and to the jurisdiction of the United States District Court for the Northern District of Texas for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the state courts of Texas or the United States District Court for the Northern District of Texas, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

[Bnkr. Dkt. 499 at Ex. 7 § 6.16].

52.    Defendants curiously fail to address this dispute resolution provision in the argument section of their Motion, instead relegating this rather crucial fact to a one-off mention in the background section.

53.    <u>Second</u>, the Stock Amendment (like the Voting Agreement) contemplates that any dispute arising from that contract will be heard by a court—not an arbitrator. The Stock Amendment specifically references and conditionally intended to amend the March 5, 2024, Stock Purchase Agreements entered into between MSM and TBN, on the one hand, and MSM and Peteski, on the other. [Bnkr. Dkt. 499 at Ex. 59].  Section 9(f) of the Stock Purchase Agreements states:

> (f) Severability. If any provision of this Agreement is held by a ***court*** to be invalid, void or unenforceable, the remaining provisions shall nevertheless continue in full force and effect without being impaired or invalidated in any way and shall be construed in accordance with the purposes and tenor and effect of this Agreement.

[Bnkr. Dkt. 499 at Exs. 4 § 9(f), 6 § 9(f)]. So not only does the Stock Amendment not contain an arbitration provision, but it acknowledges that a court is the proper adjudicator of any disputes.

54.     _Third_, the BLI, Voting Agreement, and Stock Amendment are not "contemporaneously executed" agreements. The BLI was executed on January 10, 2023. It was not until fourteen months later, on March 5, 2024, that TBN, Peteski, and MSM executed the Voting Agreement and the Stock Purchase Agreements. A further five months elapsed before the August 8, 2024, Stock Amendment was signed. So, unlike the situations in _Motorola_ and _Hardee's_, the parties' intent _vel non_ to arbitrate claims based on the Voting Agreement and Stock Amendment must be ascertained by looking at the text of those contracts, not at an agreement executed over a year prior. As neither contain an arbitration provision—and in fact expressly or impliedly contemplate that a court will hear any resulting disputes—the BLI's arbitration provision has no application. This Court should hear Counts 4 through 7 as well.

**C.     This Court Should Not Abstain from Hearing TBN's Claims.**

55.     As an alternative request, Defendants ask this Court to abstain from hearing TBN's Complaint pursuant to 28 U.S.C. § 1334. But Defendants downplay the centrality of TBN's claims to the underlying bankruptcy case or their potential impact on efficient administration of the estate.

56.     Section 1334 provides that "nothing in this section prevents a district court in the interest of justice, or in the comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11." 28 U.S.C. § 1334(c)(1). Although the Court is not required to abstain under § 1334(c)(2), it may discretionarily decline to hear the proceedings, just as it may choose to remand a removed case on any equitable ground.

57.    To guide the exercise of that discretion, courts in this District have adopted a multi-factor test to determine the propriety of abstention. These factors include:

(1) The effect or lack thereof on the efficient administration of the estate if the court decides to abstain;

(2) The extent to which state law issues predominate over bankruptcy issues;

(3) The difficult or unsettled nature of appliable law;

(4) The presence of a related proceeding commenced in state court or another nonbankruptcy proceeding;

(5) The jurisdictional basis, if any, other than 28 U.S.C. § 1334;

(6) The degree of relatedness or remoteness of the proceeding to the main bankruptcy case;

(7) The substance rather than the form of an asserted core proceeding;

(8) The feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court;

(9) The burden of the proceeding on the court's docket;

(10) The likelihood that the commencement of the proceeding in the removal court involves forum shopping by one of the parties;

(11) The existence of a right to a jury trial;

(12) The presence in the proceeding of non-debtor parties;

(13) Comity; and

(14) The possibility of prejudice to the other parties in the action.

*See*, *e.g.*, *Lone Star Fund V (U.S.), LP v. Barclays Bank PLC*, Civil Action No. 3:08-CV-0261-L, 2008 WL 4449508, at *4–*5 (N.D. Tex. Sept. 30, 2008), aff'd, 594 F.3d 383 (5th Cir. 2010); *Principal Life Ins. Co. v. JPMorgan Chase Bank, N.A.* (*In re Brook Mays Music Co.*), 363 B.R. 801, 817 (Bankr. N.D. Tex. 2007).

58.    The first factor—concern regarding the economical and efficient administration of the bankruptcy estate—is "paramount." *C.f.*, *In re Schouten*, 657 B.R. 531, 541 (Bankr. N.D. Tex. 2024) (explaining the importance of economy and efficiency in the related context of transfer of venue). Despite Defendants' arguments to the contrary [*see* Adv. Dkt. 70 at 22], this factor weighs heavily against abstention. The issues raised by TBN's Complaint—Defendants' failure to perform contractual obligations and improper attempt to wrest control of MSM away from TBN—are matters that have already featured heavily in proceedings before this Court in the underlying bankruptcy case. While Defendants claim that "any corporate governance issues raised in the… Complaint through the counts related to the Voting Agreement and Stock Amendment are already slated to be heard by this Court in conjunction with TBN's Motion to Dismiss, and thus, will be resolved shortly" [Adv. Dkt. 70 at 22], there is ample reason to believe that will not be the case.

59.    In the event that a Chapter 7 or Chapter 11 Trustee is appointed as a result of TBN's motion to dismiss, there is a strong possibility that the Trustee will investigate claims against Defendants for the precise same conduct that TBN complains of. In the event the Trustee reaches the same conclusion that TBN did—that Defendants wholly failed in their contractual duties— both TBN and MSM will have similar claims against Defendants with nearly completely overlapping needs for fact development and damage valuations. Should the Court abstain from hearing TBN's Complaint, these cases will proceed in parallel—one before this Court and the other

in another court or before an arbitrator—doubling the resources needed to accomplish the same task.

60.    Relatedly, this risk of dueling lawsuits concerning the same subject invites a risk of inconsistent rulings before different tribunals. As a result, the eighth factor also weighs against abstention. *See In re Rodriguez*, No. 10-70606, 2021 WL 4562254, at *5 (Bankr. S.D. Tex. Oct. 5, 2021).

61.    As to the second factor—the extent to which state law issues predominate over bankruptcy issues—TBN's claims admittedly are state law contract and tort claims. However, the impact of these claims on the bankruptcy proceeding cannot be overstated. The outcome of the corporate governance challenges brought by TBN present a host of ratification and waiver issues that profoundly affect MSM's liabilities and its potential claims against both TBN and Peteski/McGraw. Accordingly, the second factor also strongly weighs against abstention.

62.    Regarding the third factor—whether the applicable law is unsettled or difficult— this factor also weighs against abstention. Despite the factually complex dispute between TBN and Defendants, the legal basis for TBN's claims is straightforward. This Court is more than capable of adjudicating these claims.

63.    In the face of these serious concerns about the implications of this Court's potential abstention, Defendants' arguments in opposition essentially boil down to an intentionally myopic view that a lawsuit between non-debtors has no appreciable impact on the underlying bankruptcy case. [Adv. Dkt. 70 at 22]. But that is simply not the case. This Court has already heard a great deal from the parties regarding the disputes addressed in TBN's Complaint and understands their relevance and impact on the orderly and efficient administration of MSM's bankruptcy estate.

**D.      This Court Has Subject Matter Jurisdiction over TBN's Claims.**

64.      Lastly, Defendants urge that this Court lacks subject matter jurisdiction over TBN's Complaint. But TBN's Complaint falls well within the "broad" jurisdiction granted to bankruptcy courts. *In re KSRP, Ltd.*, 809 F.3d 263, 266 (5th Cir. 2015) (citing *Fire Eagle L.L.C. v. Bischoff* (*In re Spillman*), 710 F.3d 299, 304–05 (5th Cir. 2013)).

65.      It is well established that "[f]ederal courts have 'related to' subject matter jurisdiction over litigation arising from a bankruptcy case if the 'proceeding could conceivably affect the estate being administered in bankruptcy.'" *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 386 (5th Cir. 2010) (quoting *In re TXNB Internal Case*, 483 F.3d 292, 298 (5th Cir. 2007)). "'Related to' jurisdiction includes any litigation where the outcome could alter, positively or negatively, the debtor's rights, liabilities, options, or freedom of action or could influence the administration of the bankrupt estate." *Id.* (citation omitted). Further, when courts "define 'related to' jurisdiction, [they] should 'avoid the inefficiencies of piecemeal adjudication and promote judicial economy by aiding in the efficient and expeditious resolution of all matters connected to the debtor's estate.'" *Feld v. Zale Corp.* (*In re Zale*), 62 F.3d 746, 752 (5th Cir. 1995) (citing *Miller v. Kemira, Inc.* (*In re Lemco Gypsum, Inc.*), 910 F.2d 784, 787 (11th Cir. 1990)).

66.      Contrary to Defendants' assertions, the Fifth Circuit has repeatedly held that "related-to" jurisdiction may extend to non-debtors' state-law disputes, so long as they could have "any conceivable effect" on the bankruptcy estate. *See*, *e.g.*, *In re Spillman*, 710 F.3d at 305 (5th Cir. 2013); *In re Canion*, 196 F.3d 579, 586 (5th Cir. 1999).

67.      Among other things, TBN's Complaint seeks judicial determinations of the effect of the BLI, the constitution of MSM board of directors, and MSM's ownership structure. [*See* Adv. Dkt. 51 at 26–32]. It cannot be gainsaid that the Complaint does not have "any conceivable effect"

on the bankruptcy estate when it requests rescission and restoration of the parties to the status quo ante with respect to the foundational document of the Debtor and documents purporting to dramatically change the ownership and operational control of the Debtor. [*See* Adv. Dkt. 51 at 27 (requesting recission of the BLI), 30 (requesting rescission of the Stock Amendment), 32 (requesting clarification that TBN's directors remain on MSM's board and that the actions of McGraw as "sole director" are null and void). Significant liabilities of the Debtor, including the CrossSeed note, hinge on the determination of the existence of corporate authority (or lack thereof) to saddle MSM with those liabilities in the first place. Accordingly, TBN's claims quite clearly could have an effect on MSM's bankruptcy estate and, so, fall within this Court's broad grant of "related to" jurisdiction under 28 U.S.C. § 1334. Defendants' request to dismiss the Complaint should be denied.

## IV.    CONCLUSION

68.    WHEREFORE, TBN respectfully requests that this Court enter an order (1) denying Defendants' motion to compel the claims in TBN's Complaint [Adv. Dkt. 51] to arbitration, (2) denying Defendants' request for permissive abstention, and (3) asserting subject matter jurisdiction over the Complaint pursuant to 28 U.S.C. § 1334.

*[The remainder of this page is intentionally left blank]*

DATED: October 23, 2025

Respectfully submitted by:

*/s/ Steven C. Lockhart*
Holland N. O'Neil (TX 14864700)
Robert Slovak (TX 24013523)
Steven C. Lockhart (TX 24036981)
Mark C. Moore (TX 24074751)
Stephanie L. McPhail (TX 24104104)
Davis G. Mosmeyer III (TX 24106346)
**FOLEY & LARDNER LLP**
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
honeil@foley.com
rslovak@foley.com
slockhart@foley.com
mmoore@foley.com
smcphail@foley.com
dmosmeyer@foley.com

-and-

Rajiv Dharnidharka
(admitted *pro hac vice*)
**FOLEY & LARDNER LLP**
555 California Steet, Suite 1700
San Francisco, CA 94104
Telephone: (415) 434-4484
Facsimile: (415) 434-4507
rajiv.dharnidharka@foley.com

-and-

Nora J. McGuffey (TX 24121000)
**FOLEY & LARDNER LLP**
321 North Clark Street, Suite 3000
Chicago, IL 60654
Telephone: (312) 832-4366
Facsimile: (312) 832-4700
nora.mcguffey@foley.com

***Attorneys for Trinity Broadcasting of Texas, Inc.
dba Trinity Broadcasting Network and TCT
Ministries, Inc.***

## <u>CERTIFICATE OF SERVICE</u>

I certify that I caused the foregoing document to be filed on October 23, 2025, using the Court's CM/ECF System which caused it to be served upon those parties registered in the system to receive such service.

*/s/ Steven C. Lockhart*
Steven C. Lockhart